(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KERRY, SECRETARY OF STATE, ET AL. *v.* DIN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 13–1402.  Argued February 23, 2015—Decided June 15, 2015

Respondent Fauzia Din petitioned to have her husband, Kanishka Berashk, a resident citizen of Afghanistan and former civil servant in the Taliban regime, classified as an "immediate relative" entitled to priority immigration status.  Din's petition was approved, but Berashk's visa application was ultimately denied.  A consular officer informed Berashk that he was inadmissible under §1182(a)(3)(B), which excludes aliens who have engaged in "[t]errorist activities," but the officer provided no further information.  Unable to obtain a more detailed explanation for Berashk's visa denial, Din filed suit in Federal District Court, which dismissed her complaint.  The Ninth Circuit reversed, holding that Din had a protected liberty interest in her marriage that entitled her to review of the denial of Berashk's visa. It further held that the Government deprived her of that liberty interest without due process when it denied Berashk's visa application without providing a more detailed explanation of its reasons.

*Held*: The judgment is vacated, and the case is remanded.

718 F. 3d 856, vacated and remanded.

　　JUSTICE SCALIA, joined by THE CHIEF JUSTICE and JUSTICE THOMAS, concluded that the Government did not deprive Din of any constitutional right entitling her to due process of law.  Pp. 3–15.

　　(a) Under a historical understanding of the Due Process Clause, Din cannot possibly claim that the denial of Berashk's visa application deprived her of life, liberty, or property.  Pp. 4–5.

　　(b) Even accepting the textually unsupportable doctrine of implied fundamental rights, nothing in that line of cases establishes a freefloating and categorical liberty interest sufficient to trigger constitutional protection whenever a regulation touches upon any aspect of

the marital relationship.  Even if those cases could be so broadly construed, the relevant question is not whether the asserted interest "is consistent with this Court's substantive-due-process line of cases," but whether it is supported by "this Nation's history and practice," *Washington* v. *Glucksberg*, 521 U. S. 702, 723–724.  Here, the Government's long practice of regulating immigration, which has included erecting serious impediments to a person's ability to bring a spouse into the United States, precludes Din's claim.  And this Court has consistently recognized its lack of "judicial authority to substitute [its] political judgment for that of Congress" with regard to the various distinctions in immigration policy.  *Fiallo* v. *Bell*, 430 U. S. 787, 798.  Pp. 5–11.

JUSTICE KENNEDY, joined by JUSTICE ALITO, concluded that there is no need to decide whether Din has a protected liberty interest, because, even assuming she does, the notice she received satisfied due process.  Pp. 1–6.

(a) This conclusion is dictated by the reasoning of *Kleindienst* v. *Mandel*, 408 U. S. 753.  There the Court declined to balance the asserted First Amendment interest of college professors seeking a nonimmigrant visa for a revolutionary Marxist speaker against "Congress' 'plenary power to make rules for the admission of aliens,'" *id.,* at 766, and limited its inquiry to whether the Government had provided a "facially legitimate and bona fide" reason for its action, *id.,* at 770.  *Mandel*'s reasoning has particular force here, where national security is involved.  Pp. 2–3.

(b) Assuming that Din's rights were burdened directly by the visa denial, the consular officer's citation of §1182(a)(3)(B) satisfies *Mandel*'s "facially legitimate and bona fide" standard.  Given Congress' plenary power to "suppl[y] the conditions of the privilege of entry into the United States," *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537, 543, the Government's decision to exclude Berashk because he did not satisfy a statutory condition for admissibility is facially legitimate.  Supporting this conclusion is the fact that, by Din's own admission, Berashk worked for the Taliban government.  These considerations lend to the conclusion that there was a bona fide factual basis for exclusion, absent an affirmative showing of bad faith on the consular officer's part, which Din has not plausibly alleged.  Pp. 4–6.

SCALIA, J., announced the judgment of the Court and delivered an opinion, in which ROBERTS, C. J., and THOMAS, J., joined.  KENNEDY, J., filed an opinion concurring in the judgment, in which ALITO, J., joined.  BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–1402

JOHN F. KERRY, SECRETARY OF STATE, ET AL., PETITIONERS *v.* FAUZIA DIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 15, 2015]

JUSTICE SCALIA announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE and JUSTICE THOMAS join.

Fauzia Din is a citizen and resident of the United States. Her husband, Kanishka Berashk, is an Afghan citizen and former civil servant in the Taliban regime who resides in that country. When the Government declined to issue an immigrant visa to Berashk, Din sued.

The state action of which Din complains is the denial of *Berashk's* visa application. Naturally, one would expect him—not Din—to bring this suit. But because Berashk is an unadmitted and nonresident alien, he has no right of entry into the United States, and no cause of action to press in furtherance of his claim for admission. See *Kleindienst* v. *Mandel*, 408 U. S. 753, 762 (1972). So, Din attempts to bring suit on his behalf, alleging that the Government's denial of her *husband's* visa application violated *her* constitutional rights. See App. 36–37, Complaint ¶56. In particular, she claims that the Government denied her due process of law when, without adequate explanation of the reason for the visa denial, it deprived her of her constitutional right to live in the United States with her spouse. There is no such constitutional right.

What JUSTICE BREYER's dissent strangely describes as a "deprivation of her freedom to live together with her spouse in America," *post*, at 4–5, is, in any world other than the artificial world of ever-expanding constitutional rights, nothing more than a deprivation of her spouse's freedom to immigrate into America.

For the reasons given in this opinion and in the opinion concurring in the judgment, we vacate and remand.

## I

### A

Under the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U. S. C. §1101 *et seq.*, an alien may not enter and permanently reside in the United States without a visa. §1181(a). The INA creates a special visa-application process for aliens sponsored by "immediate relatives" in the United States. §§1151(b), 1153(a). Under this process, the citizen-relative first files a petition on behalf of the alien living abroad, asking to have the alien classified as an immediate relative. See §§1153(f), 1154(a)(1). If and when a petition is approved, the alien may apply for a visa by submitting the required documents and appearing at a United States Embassy or consulate for an interview with a consular officer. See §§1201(a)(1), 1202. Before issuing a visa, the consular officer must ensure the alien is not inadmissible under any provision of the INA. §1361.

One ground for inadmissibility, §1182(a)(3)(B), covers "[t]errorist activities." In addition to the violent and destructive acts the term immediately brings to mind, the INA defines "terrorist activity" to include providing material support to a terrorist organization and serving as a terrorist organization's representative. §1182(a)(3)(B)(i), (iii)–(vi).

### B

Fauzia Din came to the United States as a refugee in

2000, and became a naturalized citizen in 2007. She filed a petition to have Kanishka Berashk, whom she married in 2006, classified as her immediate relative. The petition was granted, and Berashk filed a visa application. The U. S. Embassy in Islamabad, Pakistan, interviewed Berashk and denied his application. A consular officer informed Berashk that he was inadmissible under §1182(a)(3)(B) but provided no further explanation.

Din then brought suit in Federal District Court seeking a writ of mandamus directing the United States to properly adjudicate Berashk's visa application; a declaratory judgment that 8 U. S. C. §1182(b)(2)–(3), which exempts the Government from providing notice to an alien found inadmissible under the terrorism bar, is unconstitutional as applied; and a declaratory judgment that the denial violated the Administrative Procedure Act. App. 36–39, Complaint ¶¶55–68. The District Court granted the Government's motion to dismiss, but the Ninth Circuit reversed. The Ninth Circuit concluded that Din "has a protected liberty interest in marriage that entitled [her] to review of the denial of [her] spouse's visa," 718 F. 3d 856, 860 (2013), and that the Government's citation of §1182(a)(3)(B) did not provide Din with the "limited judicial review" to which she was entitled under the Due Process Clause, *id.,* at 868. This Court granted certiorari. 573 U. S. \_\_\_ (2014).

II

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." Although the amount and quality of process that our precedents have recognized as "due" under the Clause has changed considerably since the founding, see *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 28–36 (1991) (SCALIA, J., concurring in judgment), it remains the case that *no* process is due if one is not deprived of "life, liberty, or property," *Swarthout* v. *Cooke*,

562 U. S. 216, 219 (2011) (*per curiam*). The first question that we must ask, then, is whether the denial of Berashk's visa application deprived Din of any of these interests. Only if we answer in the affirmative must we proceed to consider whether the Government's explanation afforded sufficient process.

A

The Due Process Clause has its origin in Magna Carta. As originally drafted, the Great Charter provided that "[n]o freeman shall be taken, or imprisoned, or be disseised of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed; nor will we not pass upon him, nor condemn him, but by lawful judgment of his peers, or *by the law of the land*." Magna Carta, ch. 29, in 1 E. Coke, The Second Part of the Institutes of the Laws of England 45 (1797) (emphasis added). The Court has recognized that at the time of the Fifth Amendment's ratification, the words "due process of law" were understood "to convey the same meaning as the words 'by the law of the land'" in Magna Carta. *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 276 (1856). Although the terminology associated with the guarantee of due process changed dramatically between 1215 and 1791, the general scope of the underlying rights protected stayed roughly constant.

Edward Coke, whose Institutes "were read in the American Colonies by virtually every student of law," *Klopfer* v. *North Carolina*, 386 U. S. 213, 225 (1967), thoroughly described the scope of the interests that could be deprived only pursuant to "the law of the land." Magna Carta, he wrote, ensured that, without due process, "no man [may] be taken or imprisoned"; "disseised of his lands, or tenements, or dispossessed of his goods, or chattels"; "put from his livelihood without answer"; "barred to have the benefit of the law"; denied "the franchises, and priviledges, which

the subjects have of the gift of the king"; "exiled"; or "forejudged of life, or limbe, disherited, or put to torture, or death." 1 Coke, *supra,* at 46–48. Blackstone's description of the rights protected by Magna Carta is similar, although he discusses them in terms much closer to the "life, liberty, or property" terminology used in the Fifth Amendment. He described first an interest in "personal security," "consist[ing] in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation." 1 W. Blackstone, Commentaries on the Laws of England 125 (1769). Second, the "personal liberty of individuals" "consist[ed] in the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint." *Id.,* at 130. And finally, a person's right to property included "the free use, enjoyment, and disposal of all his acquisitions." *Id.,* at 134.

Din, of course, could not conceivably claim that the denial of Berashk's visa application deprived her—or for that matter even Berashk—of life or property; and under the above described historical understanding, a claim that it deprived her of liberty is equally absurd. The Government has not "taken or imprisoned" Din, nor has it "confine[d]" her, either by "keeping [her] against h[er] will in a private house, putting h[er] in the stocks, arresting or forcibly detaining h[er] in the street." *Id.,* at 132. Indeed, not even Berashk has suffered a deprivation of liberty so understood.

### B

Despite this historical evidence, this Court has seen fit on several occasions to expand the meaning of "liberty" under the Due Process Clause to include certain implied "fundamental rights." (The reasoning presumably goes like this: If you have a right to do something, you are free to do it, and deprivation of freedom is a deprivation of

"liberty"—never mind the original meaning of that word in the Due Process Clause.) These implied rights have been given *more* protection than "life, liberty, or property" properly understood. While one may be dispossessed of property, thrown in jail, or even executed so long as proper procedures are followed, the enjoyment of implied constitutional rights cannot be limited at all, except by provisions that are "narrowly tailored to serve a compelling state interest." *Reno* v. *Flores*, 507 U. S. 292, 301–302 (1993). Din does not explicitly argue that the Government has violated this absolute prohibition of the *substantive* component of the Due Process Clause, likely because it is obvious that a law barring aliens engaged in terrorist activities from entering this country *is* narrowly tailored to serve a compelling state interest. She nevertheless insists that, because enforcement of the law affects her enjoyment of an implied fundamental liberty, the Government must first provide her a full battery of procedural-due-process protections.

I think it worth explaining why, *even if* one accepts the textually unsupportable doctrine of implied fundamental rights, Din's arguments would fail. Because "extending constitutional protection to an asserted right or liberty interest . . . place[s] the matter outside the arena of public debate and legislative action," *Washington* v. *Glucksberg*, 521 U. S. 702, 720 (1997), and because the "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," *Collins* v. *Harker Heights,* 503 U. S. 115, 125 (1992), "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field," *ibid.* Accordingly, before conferring constitutional status upon a previously unrecognized "liberty," we have required "a careful description of the asserted fundamental liberty interest," as well as a demonstration that the interest is "objectively, deeply rooted in this Nation's history and

tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed." *Glucksberg, supra*, at 720–721 (citations and internal quotation marks omitted).

Din describes the denial of Berashk's visa application as implicating, alternately, a "liberty interest in her marriage," Brief for Respondent 28, a "right of association with one's spouse," *id.,* at 18, "a liberty interest in being reunited with certain blood relatives," *id.,* at 22, and "the liberty interest of a U. S. citizen under the Due Process Clause to be free from arbitrary restrictions on his right to live with his spouse," *ibid.* To be sure, this Court has at times indulged a propensity for grandiloquence when reviewing the sweep of implied rights, describing them so broadly that they would include not only the interests Din asserts but many others as well. For example: "Without doubt, [the liberty guaranteed by the Due Process Clause] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, [and] to worship God according to the dictates of his own conscience" *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923). But this Court is not bound by dicta, especially dicta that have been repudiated by the holdings of our subsequent cases. And the actual holdings of the cases Din relies upon hardly establish the capacious right she now asserts.

Unlike the States in *Loving* v. *Virginia*, 388 U. S. 1 (1967), *Zablocki* v. *Redhail*, 434 U. S. 374 (1978), and *Turner* v. *Safley*, 482 U. S. 78 (1987), the Federal Government here has not attempted to forbid a marriage. Although Din and the dissent borrow language from those cases invoking a fundamental right to marriage, they both implicitly concede that no such right has been infringed in this case. Din relies on the "associational interests in

marriage that necessarily are protected by the right to marry," and that are "presuppose[d]" by later cases establishing a right to marital privacy. Brief for Respondent 16, 18. The dissent supplements the fundamental right to marriage with a fundamental right to live in the United States in order to find an affected liberty interest. *Post*, at 2–3 (BREYER, J., dissenting).

Attempting to abstract from these cases some liberty interest that might be implicated by Berashk's visa denial, Din draws on even more inapposite cases. *Meyer*, for example, invalidated a state statute proscribing the teaching of foreign language to children who had not yet passed the eighth grade, reasoning that it violated the teacher's "right thus to teach and the right of parents to engage him so to instruct their children." 262 U. S., at 400. *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535 (1925), extended *Meyer*, finding that a law requiring children to attend public schools "interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Moore* v. *East Cleveland,* 431 U. S. 494, 505–506 (1977), extended this interest in raising children to caretakers in a child's extended family, striking down an ordinance that limited occupancy of a single-family house to members of a nuclear family on the ground that "[d]ecisions concerning child rearing . . . long have been shared with grandparents or other relatives." And *Griswold* v. *Connecticut*, 381 U. S. 479, 485 (1965), concluded that a law criminalizing the use of contraceptives by married couples violated "penumbral rights of 'privacy and repose'" protecting "the sacred precincts of the marital bedroom"—rights which do not plausibly extend into the offices of our consulates abroad.

Nothing in the cases Din cites establishes a free-floating and categorical liberty interest in marriage (or any other formulation Din offers) sufficient to trigger constitutional protection whenever a regulation in any way touches upon

an aspect of the marital relationship. Even if our cases could be construed so broadly, the relevant question is not whether the asserted interest "is consistent with this Court's substantive-due-process line of cases," but whether it is supported by "this Nation's history and practice." *Glucksberg*, 521 U. S., at 723–724 (emphasis deleted). Even if we might "imply" a liberty interest in marriage generally speaking, that must give way when there is a tradition denying the specific application of that general interest. Thus, *Glucksberg* rejected a claimed liberty interest in "self-sovereignty" and "personal autonomy" that extended to assisted suicide when there was a longstanding tradition of outlawing the practice of suicide. *Id.*, at 724, 727–728 (internal quotation marks omitted).

Here, a long practice of regulating spousal immigration precludes Din's claim that the denial of Berashk's visa application has deprived her of a fundamental liberty interest. Although immigration was effectively unregulated prior to 1875, as soon as Congress began legislating in this area it enacted a complicated web of regulations that erected serious impediments to a person's ability to bring a spouse into the United States. See Abrams, What Makes the Family Special? 80 U. Chi. L. Rev. 7, 10–16 (2013).

Most strikingly, perhaps, the Expatriation Act of 1907 provided that "any American woman who marries a foreigner shall take the nationality of her husband." Ch. 2534, 34 Stat. 1228. Thus, a woman in Din's position not only lacked a liberty interest that might be affected by the Government's disposition of her husband's visa application, she lost her *own* rights as a citizen upon marriage. When Congress began to impose quotas on immigration by country of origin less than 15 years later, with the Immigration Act of 1921, it omitted fiances and husbands from the family relations eligible for preferred status in the allocation of quota spots. §2(d), 42 Stat. 6. Such relations

were similarly excluded from the relations eligible for nonquota status, when that status was expanded three years later. Immigration Act of 1924, §4(a), 43 Stat. 155.

To be sure, these early regulations were premised on the derivative citizenship of women, a legacy of the law of coverture that was already in decline at the time. C. Bredbenner, A Nationality of Her Own 5 (1998). Modern equal-protection doctrine casts substantial doubt on the permissibility of such asymmetric treatment of women citizens in the immigration context, and modern moral judgment rejects the premises of such a legal order. Nevertheless, this all-too-recent practice repudiates any contention that Din's asserted liberty interest is "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty." *Glucksberg*, *supra,* at 720 (citations and internal quotations marks omitted).

Indeed, the law showed little more solicitude for the marital relationship when it was a male resident or citizen seeking admission for his fiancee or wife. The Immigration Act of 1921 granted nonquota status only to unmarried, minor children of citizens, §2(a), while granting fiancees and wives preferred status *within* the allocation of quota spots, §2(d). In other words, a citizen could move his spouse forward in the line, but once all the quota spots were filled for the year, the spouse was barred without exception. This was not just a theoretical possibility: As one commentator has observed, "[f]or many immigrants, the family categories did little to help, because the quotas were so small that the number of family members seeking slots far outstripped the number available." Abrams, *supra,* at 13.

Although Congress has tended to show "a continuing and kindly concern . . . for the unity and the happiness of the immigrant family," E. Hutchinson, Legislative History of American Immigration Policy 1798–1965, p. 518 (1981), this has been a matter of legislative grace rather than

fundamental right. Even where Congress has provided special privileges to promote family immigration, it has also "written in careful checks and qualifications." *Ibid.* This Court has consistently recognized that these various distinctions are "policy questions entrusted exclusively to the political branches of our Government, and we have no judicial authority to substitute our political judgment for that of the Congress." *Fiallo* v. *Bell*, 430 U. S. 787, 798 (1977). Only by diluting the meaning of a fundamental liberty interest and jettisoning our established jurisprudence could we conclude that the denial of Berashk's visa application implicates any of Din's fundamental liberty interests.

C

JUSTICE BREYER suggests that procedural due process rights attach to liberty interests that either are (1) created by nonconstitutional law, such as a statute, or (2) "sufficiently important" so as to "flow 'implicit[ly]' from the design, object, and nature of the Due Process Clause." *Post*, at 2.

The first point is unobjectionable, at least given this Court's case law. See, *e.g., Goldberg* v. *Kelly*, 397 U. S. 254, 262, and n. 8 (1970); *Collins* 503 U. S., at 129. But it is unhelpful to Din, who does not argue that a statute confers on her a liberty interest protected by the Due Process Clause. JUSTICE BREYER attempts to make this argument for Din, latching onto language in *Wilkinson* v. *Austin*, 545 U. S. 209, 221 (2005), saying that a liberty interest "may arise from an expectation or interest created by state laws or policies." Such an "expectation" has been created here, he asserts, because "the law . . . surrounds marriage with a host of legal protections to the point that it creates a strong expectation that government will not deprive married individuals of their freedom to live together without strong reasons and (in individual cases)

without fair procedure," *post,* at 3. But what *Wilkinson* meant by an "expectation or interest" was not that sort of judicially unenforceable substantial hope, but a present and legally recognized substantive entitlement.* As sole support for its conclusion that nonconstitutional law can create constitutionally protected liberty interests, *Wilkinson* cited *Wolff* v. *McDonnell*, 418 U. S. 539, 556–558 (1974), which held that a prisoner could not be deprived of statutory good-time credit without procedural due process. That was not because a prisoner might have "'a strong expectation'" that the government would not deprive him of good-time credit "'without strong reasons'" or "'fair procedure,'" but because "the State itself has not only provided a statutory *right* to good time [credit] but also specifies that it is to be forfeited *only* for serious misbehavior," *id.,* at 557 (emphasis added). The legal benefits afforded to marriages and the preferential treatment accorded to visa applicants with citizen relatives are insufficient to confer on Din a right that can be deprived only pursuant to procedural due process.

JUSTICE BREYER's second point—that procedural due process rights attach even to some nonfundamental liberty interests that have *not* been created by statute—is much more troubling. He relies on the implied-fundamental-rights cases discussed above to divine a "right of spouses to live together and to raise a family," along with "a citizen's right to live within this country." *Post*, at 2–3. But perhaps recognizing that our established methodology for identifying fundamental rights cuts against his conclusion, see Part II–B, *supra*, he argues that the term "liberty" in the Due Process Clause includes implied rights that,

_____

*JUSTICE BREYER characterizes this as a reintroduction of "the rights/privilege distinction that this Court rejected almost five decades ago." *Post*, at 3. Not so. All I insist upon (and all that our cases over the past five decades require) is that the privilege be one to which the claimant has been given an entitlement.

although not so fundamental as to deserve substantive-due-process protection, are important enough to deserve procedural-due-process protection. *Post*, at 2. In other words, there are two categories of implied rights protected by the Due Process Clause: really fundamental rights, which cannot be taken away at all absent a compelling state interest; and not-so-fundamental rights, which can be taken away so long as procedural due process is observed.

The dissent fails to cite a single case supporting its novel theory of implied nonfundamental rights. It is certainly true that *Vitek* v. *Jones*, 445 U. S. 480 (1980), and *Washington* v. *Harper*, 494 U. S. 210 (1990), do not entail implied *fundamental* rights, but this is because they do not entail *implied* rights at all. *Vitek* concerned the involuntary commitment of a prisoner, deprivation of the expressly protected right of liberty under the original understanding of the term, see Part II–A, *supra*. "'Among the historic liberties' protected by the Due Process Clause is the 'right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.'" *Vitek, supra,* at 492. The same is true of *Harper*, which concerned forced administration of psychotropic drugs to an inmate. 494 U. S., at 214. Arguably, *Paul* v. *Davis*, 424 U. S. 693 (1976), also addressed an interest expressly contemplated within the meaning of "liberty." See 1 W. Blackstone, Commentaries on the Laws of England 125 ("The right of personal security consists in a person's . . . reputation"). But that case is of no help to the dissent anyway, since it found no liberty interest entitled to the Due Process Clause's protection. *Paul, supra,* at 713–714. Finally, the dissent points to *Goss* v. *Lopez*, 419 U. S. 565, 574 (1975), a case that "recognize[d] . . . as a property interest" a student's right to a public education conferred by Ohio's express statutory creation of a public school system; and further concluded that the student's 10-day suspension

implicated the constitutionally grounded liberty interest in "'a person's good name, reputation, honor, or integrity.'"

Ultimately, the dissent identifies no case holding that there is an implied nonfundamental right protected by procedural due process, and only one case even *suggesting* that there is. That suggestion, in *Smith* v. *Organization of Foster Families For Equality & Reform*, 431 U. S. 816 (1977), is contained in dictum in a footnote, *id.*, at 842, n. 48. The holding of the case was that "the procedures provided by New York State . . . and by New York Cit[y] . . . are adequate to protect *whatever* liberty interests appellees *may* have." *Id.,* at 856 (emphasis added).

The footnoted dictum that JUSTICE BREYER proposes to elevate to constitutional law is a dangerous doctrine. It vastly expands the scope of our implied-rights jurisprudence by setting it free from the requirement that the liberty interest be "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty," *Glucksberg,* 521 U. S*.,* at 720–721 (internal quotation marks omitted). Even shallow-rooted liberties would, thanks to this new procedural-rights-only notion of quasi-fundamental rights, qualify for judicially imposed procedural requirements. Moreover, JUSTICE BREYER gives no basis for distinguishing the fundamental rights recognized in the cases he depends on from the *nonfundamental* right he believes they give rise to in the present case.

Neither Din's right to live with her spouse nor her right to live within this country is implicated here. There is a "simple distinction between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and action that is directed against a third party and affects the citizen only indirectly or incidentally." *O'Bannon* v. *Town Court Nursing Center*, 447 U. S. 773, 788 (1980). The Government has not refused to recognize Din's marriage to Berashk, and Din remains free

to live with her husband anywhere in the world that both individuals are permitted to reside. And the Government has not expelled Din from the country. It has simply determined that Kanishka Berashk engaged in terrorist activities within the meaning of the Immigration and Nationality Act, and has therefore denied him admission into the country. This might, indeed, deprive Din of something "important," *post*, at 2, but if that is the criterion for JUSTICE BREYER's new pairing of substantive and procedural due process, we are in for quite a ride.

*       *       *

Because Fauzia Din was not deprived of "life, liberty, or property" when the Government denied Kanishka Berashk admission to the United States, there is no process due to her under the Constitution. To the extent that she received any explanation for the Government's decision, this was more than the Due Process Clause required. The judgment of the Ninth Circuit is vacated, and the case is remanded for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

No. 13–1402

---

## JOHN F. KERRY, SECRETARY OF STATE, ET AL., PETITIONERS *v*. FAUZIA DIN

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 15, 2015]

JUSTICE KENNEDY, with whom JUSTICE ALITO joins, concurring in the judgment.

The respondent, Fauzia Din, is a citizen and resident of the United States. She asserts that petitioner Government officials (collectively, Government) violated her own constitutional right to live in this country with her husband, an alien now residing in Afghanistan. She contends this violation occurred when the Government, through State Department consular officials, denied her spouse's immigrant visa application with no explanation other than that the denial was based on 8 U. S. C. §1182(a)(3)(B), the statutory provision prohibiting the issuance of visas to persons who engage in terrorist activities.

The plurality is correct that the case must be vacated and remanded. But rather than deciding, as the plurality does, whether Din has a protected liberty interest, my view is that, even assuming she does, the notice she received regarding her husband's visa denial satisfied due process.

Today's disposition should not be interpreted as deciding whether a citizen has a protected liberty interest in the visa application of her alien spouse. The Court need not decide that issue, for this Court's precedents instruct that, even assuming she has such an interest, the Government satisfied due process when it notified Din's husband that

his visa was denied under the immigration statute's ter-rorism bar, §1182(a)(3)(B).  See *ante,* at 2.

## I

The conclusion that Din received all the process to which she was entitled finds its most substantial instruc-tion in the Court's decision in *Kleindienst* v. *Mandel*, 408 U. S. 753 (1972).  There, college professors—all of them citizens—had invited Dr. Ernest Mandel, a self-described "'revolutionary Marxist,'" to speak at a conference at Stanford University.  *Id.,* at 756.  Yet when Mandel ap-plied for a temporary nonimmigrant visa to enter the country, he was denied.  At the time, the immigration laws deemed aliens "who advocate[d] the economic, interna-tional, and governmental doctrines of World communism" ineligible for visas.  §1182(a)(28)(D) (1964 ed.).  Aliens ineligible under this provision did have one opportunity for recourse: The Attorney General was given discretion to waive the prohibition and grant individual exceptions, allowing the alien to obtain a temporary visa.  §1182(d)(3).  For Mandel, however, the Attorney General, acting through the Immigration and Naturalization Service (INS), declined to grant a waiver.  In a letter regarding this decision, the INS explained Mandel had exceeded the scope and terms of temporary visas on past trips to the United States, which the agency deemed a "'flagrant abuse of the opportunities afforded him to express his views in this country.'"  408 U. S., at 759.

The professors who had invited Mandel to speak chal-lenged the INS' decision, asserting a First Amendment right to "'hear his views and engage him in a free and open academic exchange.'"  *Id.,* at 760.  They claimed the Attorney General infringed this right when he refused to grant Mandel relief.  See *ibid.*

The Court declined to balance the First Amendment interest of the professors against "Congress' 'plenary

power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden.'" *Id.,* at 766, 768 (citation omitted). To do so would require "courts in each case . . . to weigh the strength of the audience's interest against that of the Government in refusing a [visa] to the particular applicant," a nuanced and difficult decision Congress had "properly . . . placed in the hands of the Executive." *Id.,* at 769.

Instead, the Court limited its inquiry to the question whether the Government had provided a "facially legitimate and bona fide" reason for its action. *Id.,* at 770. Finding the Government had proffered such a reason— Mandel's abuse of past visas—the Court ended its inquiry and found the Attorney General's action to be lawful. See *ibid.* The Court emphasized it did not address "[w]hat First Amendment or other grounds may be available for attacking an exercise of discretion for which no justification whatsoever is advanced." *Ibid.*

The reasoning and the holding in *Mandel* control here. That decision was based upon due consideration of the congressional power to make rules for the exclusion of aliens, and the ensuing power to delegate authority to the Attorney General to exercise substantial discretion in that field. *Mandel* held that an executive officer's decision denying a visa that burdens a citizen's own constitutional rights is valid when it is made "on the basis of a facially legitimate and bona fide reason." *Id.*, at 770. Once this standard is met, "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against" the constitutional interests of citizens the visa denial might implicate. *Ibid.* This reasoning has particular force in the area of national security, for which Congress has provided specific statutory directions pertaining to visa applications by noncitizens who seek entry to this country.

## II

Like the professors who sought an audience with Dr. Mandel, Din claims her constitutional rights were burdened by the denial of a visa to a noncitizen, namely her husband. And as in *Mandel*, the Government provided a reason for the visa denial: It concluded Din's husband was inadmissible under §1182(a)(3)(B)'s terrorism bar. Even assuming Din's rights were burdened directly by the visa denial, the remaining question is whether the reasons given by the Government satisfy *Mandel*'s "facially legitimate and bona fide" standard. I conclude that they do.

Here, the consular officer's determination that Din's husband was ineligible for a visa was controlled by specific statutory factors. The provisions of §1182(a)(3)(B) establish specific criteria for determining terrorism-related inadmissibility. The consular officer's citation of that provision suffices to show that the denial rested on a determination that Din's husband did not satisfy the statute's requirements. Given Congress' plenary power to "suppl[y] the conditions of the privilege of entry into the United States," *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537, 543 (1950), it follows that the Government's decision to exclude an alien it determines does not satisfy one or more of those conditions is facially legitimate under *Mandel*.

The Government's citation of §1182(a)(3)(B) also indicates it relied upon a bona fide factual basis for denying a visa to Berashk. Cf. *United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1, 14–15 (1926). Din claims due process requires she be provided with the facts underlying this determination, arguing *Mandel* required a similar factual basis. It is true the Attorney General there disclosed the facts motivating his decision to deny Dr. Mandel a waiver, and that the Court cited those facts as demonstrating "the Attorney General validly exercised the plenary power that Congress delegated to the Executive."

408 U. S., at 769. But unlike the waiver provision at issue in *Mandel*, which granted the Attorney General nearly unbridled discretion, §1182(a)(3)(B) specifies discrete factual predicates the consular officer must find to exist before denying a visa. Din, moreover, admits in her Complaint that Berashk worked for the Taliban government, App. 27–28, which, even if itself insufficient to support exclusion, provides at least a facial connection to terrorist activity. Absent an affirmative showing of bad faith on the part of the consular officer who denied Berashk a visa—which Din has not plausibly alleged with sufficient particularity—*Mandel* instructs us not to "look behind" the Government's exclusion of Berashk for additional factual details beyond what its express reliance on §1182(a)(3)(B) encompassed. See 408 U. S., at 770.

The Government, furthermore, was not required, as Din claims, to point to a more specific provision within §1182(a)(3)(B). To be sure, the statutory provision the consular officer cited covers a broad range of conduct. And Din perhaps more easily could mount a challenge to her husband's visa denial if she knew the specific subsection on which the consular officer relied. Congress understood this problem, however. The statute generally requires the Government to provide an alien denied a visa with the "specific provision or provisions of law under which the alien is inadmissible," §1182(b)(1); but this notice requirement does not apply when, as in this case, a visa application is denied due to terrorism or national security concerns. §1182(b)(3). Notably, the Government is not prohibited from offering more details when it sees fit, but the statute expressly refrains from requiring it to do so.

Congress evaluated the benefits and burdens of notice in this sensitive area and assigned discretion to the Executive to decide when more detailed disclosure is appropriate. This considered judgment gives additional support to the independent conclusion that the notice given was

constitutionally adequate, particularly in light of the national security concerns the terrorism bar addresses. See *Fiallo* v. *Bell*, 430 U. S. 787, 795–796 (1977); see also *INS* v. *Aguirre-Aguirre*, 526 U. S. 415, 425 (1999). And even if Din is correct that sensitive facts could be reviewed by courts *in camera*, the dangers and difficulties of handling such delicate security material further counsel against requiring disclosure in a case such as this. Under *Mandel*, respect for the political branches' broad power over the creation and administration of the immigration system extends to determinations of how much information the Government is obliged to disclose about a consular officer's denial of a visa to an alien abroad.

For these reasons, my conclusion is that the Government satisfied any obligation it might have had to provide Din with a facially legitimate and bona fide reason for its action when it provided notice that her husband was denied admission to the country under §1182(a)(3)(B). By requiring the Government to provide more, the Court of Appeals erred in adjudicating Din's constitutional claims.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1402

_____

## JOHN F. KERRY, SECRETARY OF STATE, ET AL., PETITIONERS *v.* FAUZIA DIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 15, 2015]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

Fauzia Din, an American citizen, wants to know why the State Department denied a visa to her husband, a noncitizen. She points out that, without a visa, she and her husband will have to spend their married lives separately or abroad. And she argues that the Department, in refusing to provide an adequate reason for the denial, has violated the constitutional requirement that "[n]o person . . . be deprived of life, liberty, or property, without due process of law." U. S. Const., Amdt. 5.

In my view, Ms. Din should prevail on this constitutional claim. She possesses the kind of "liberty" interest to which the Due Process Clause grants procedural protection. And the Government has failed to provide her with the procedure that is constitutionally "due." See *Swarthout* v. *Cooke*, 562 U. S. 216, 219 (2011) (*per curiam*) (setting forth the Court's two-step inquiry for procedural due process claims). Accordingly, I would affirm the judgment of the Ninth Circuit.

I

The plurality opinion (which is not controlling) concludes that Ms. Din lacks the kind of liberty interest to which the Due Process Clause provides procedural protec-

tions.  *Ante,* at 3–15.  JUSTICE KENNEDY's opinion "*assum[es]*" that Ms. Din possesses that kind of liberty interest.  *Ante,* at 1 (opinion concurring in judgment) (emphasis added).  I agree with JUSTICE KENNEDY's assumption.  More than that, I believe that Ms. Din possesses that kind of constitutional interest.

The liberty interest that Ms. Din seeks to protect consists of her freedom to live together with her husband in the United States.  She seeks *procedural,* not *substantive,* protection for this freedom.  Compare *Wilkinson* v. *Austin*, 545 U. S. 209, 221 (2005) (Due Process Clause requires compliance with fair *procedures* when the government deprives an individual of certain "liberty" or "property" interests), with *Reno* v. *Flores*, 507 U. S. 292, 302 (1993) (Due Process Clause limits the extent to which government can *substantively* regulate certain "fundamental" rights, "no matter what process is provided").  Cf. *Smith* v. *Organization of Foster Families For Equality & Reform*, 431 U. S. 816, 842, n. 48 (1977) (liberty interests arising under the Constitution for procedural due process purposes are not the same as fundamental rights requiring substantive due process protection).

Our cases make clear that the Due Process Clause entitles her to such procedural rights as long as (1) she seeks protection for a liberty interest sufficiently important for procedural protection to flow "implicit[ly]" from the design, object, and nature of the Due Process Clause, or (2) nonconstitutional law (a statute, for example) creates "an expectation" that a person will not be deprived of that kind of liberty without fair procedures.  *Wilkinson*, *supra*, at 221.

The liberty for which Ms. Din seeks protection easily satisfies both standards.  As this Court has long recognized, the institution of marriage, which encompasses the right of spouses to live together and to raise a family, is central to human life, requires and enjoys community

support, and plays a central role in most individuals'
"orderly pursuit of happiness," *Meyer* v. *Nebraska*, 262
U. S. 390, 399 (1923). See also, *e.g., Griswold* v. *Connecti-
cut*, 381 U. S. 479, 485–486 (1965); *Zablocki* v. *Redhail*,
434 U. S. 374, 386 (1978); *Moore* v. *East Cleveland*, 431
U. S. 494, 500–503 (1977) (plurality opinion); *Smith*,
*supra,* at 843. Similarly, the Court has long recognized
that a citizen's right to live within this country, being
fundamental, enjoys basic procedural due process protec-
tion. See *Ng Fung Ho* v. *White*, 259 U. S. 276, 284–285
(1922); *Baumgartner* v. *United States*, 322 U. S. 665, 670
(1944).

At the same time, the law, including visa law, surrounds
marriage with a host of legal protections to the point that
it creates a strong expectation that government will not
deprive married individuals of their freedom to live to-
gether without strong reasons and (in individual cases)
without fair procedure. Cf. *Turner* v. *Safley*, 482 U. S. 78,
95–96 (1987) (noting various legal benefits of marriage);
8 U. S. C. §1151(b)(2)(A)(i) (special visa preference for
spouse of an American citizen). JUSTICE SCALIA's re-
sponse—that nonconstitutional law creates an "expecta-
tion" that merits procedural protection under the Due
Process Clause only if there is an unequivocal statutory
right, *ante,* at 11–12—is sorely mistaken. His argument
rests on the rights/privilege distinction that this Court
rejected almost five decades ago, in the seminal case of
*Goldberg* v. *Kelly*, 397 U. S. 254, 262 (1970). See generally
*Board of Regents of State Colleges* v. *Roth*, 408 U. S. 564,
571 (1972) ("[T]he Court has fully and finally rejected the
wooden distinction between 'rights' and 'privileges' that
once seemed to govern the applicability of procedural due
process rights"); *id.,* at 572 ("In a Constitution for a free
people, there can be no doubt that the meaning of 'liberty'
must be broad indeed").

JUSTICE SCALIA's more general response—claiming that

I have created a new category of constitutional rights, *ante,* at 12–15—misses the mark. I break no new ground here. Rather, this Court has *already* recognized that the Due Process Clause guarantees that the government will not, without fair procedure, deprive individuals of a host of rights, freedoms, and liberties that are no more important, and for which the state has created no greater expectation of continued benefit, than the liberty interest at issue here. See, *e.g., Wolff* v. *McDonnell*, 418 U. S. 539, 556–557 (1974) (prisoner's right to maintain "goodtime" credits shortening term of imprisonment; procedurally protected liberty interest based on nonconstitutional law); *Paul* v. *Davis*, 424 U. S. 693, 701 (1976) (right to certain aspects of reputation; procedurally protected liberty interest arising under the Constitution); *Goss* v. *Lopez*, 419 U. S. 565, 574–575 (1975) (student's right not to be suspended from school class; procedurally protected liberty interest arising under the Constitution); *Vitek* v. *Jones*, 445 U. S. 480, 491–495 (1980) (prisoner's right against involuntary commitment; procedurally protected liberty interest arising under the Constitution); *Washington* v. *Harper*, 494 U. S. 210, 221–222 (1990) (mentally ill prisoner's right not to take psychotropic drugs; procedurally protected liberty interest arising under the Constitution); see generally *Goldberg, supra,* at 262–263 (right to welfare benefits; procedurally protected property interest based on nonconstitutional law). But cf. *ante,* at 12–14 (plurality opinion) (making what I believe are unsuccessful efforts to distinguish these cases). How could a Constitution that protects individuals against the arbitrary deprivation of so diverse a set of interests not also offer some form of procedural protection to a citizen threatened with governmental deprivation of her freedom to live together with her spouse in America? As compared to reputational harm, for example, how is Ms. Din's liberty interest any less worthy of due process protections?

## II

## A

The more difficult question is the nature of the procedural protection required by the Constitution. After all, sometimes, as with the military draft, the law separates spouses with little individualized procedure. And sometimes, as with criminal convictions, the law provides procedure to one spouse but not to the other. Unlike criminal convictions, however, neither spouse here has received any procedural protection. Cf. *Ingraham* v. *Wright*, 430 U. S. 651 (1977) (availability of alternative procedures can satisfy due process). Compare *Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S. 206, 213 (1953) (no due process protections for aliens outside United States), with *Zadvydas* v. *Davis*, 533 U. S. 678, 693 (2001) (such protections are available for aliens inside United States). And, unlike the draft (justified by a classic military threat), the deprivation does not apply similarly to hundreds of thousands of American families. Cf. *Bi-Metallic Investment Co.* v. *State Bd. of Equalization of Colo.*, 239 U. S. 441, 445 (1915).

Rather, here, the Government makes individualized visa determinations through the application of a legal rule to particular facts. Individualized adjudication normally calls for the ordinary application of Due Process Clause procedures. *Londoner* v. *City and County of Denver*, 210 U. S. 373, 385–386 (1908). And those procedures normally include notice of an adverse action, an opportunity to present relevant proofs and arguments, before a neutral decisionmaker, and reasoned decisionmaking. See *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 533 (2004) (plurality opinion); see also Friendly, Some Kind of a Hearing, 123 U. Pa. L. Rev. 1267, 1278–1281 (1975). These procedural protections help to guarantee that government will not make a decision directly affecting an individual arbitrarily but will do so through the reasoned application of a rule of

law. It is that rule of law, stretching back at least 800 years to Magna Carta, which in major part the Due Process Clause seeks to protect. *Hurtado* v. *California*, 110 U. S. 516, 527 (1884).

Here, we need not consider all possible procedural due process elements. Rather we consider only the minimum procedure that Ms. Din has requested—namely, a statement of reasons, some kind of explanation, as to why the State Department denied her husband a visa.

We have often held that this kind of statement, permitting an individual to understand *why* the government acted as it did, is a fundamental element of due process. See, *e.g., Goldberg*, 397 U. S., at 267–268; *Perry* v. *Sindermann*, 408 U. S. 593, 603 (1972); *Morrissey* v. *Brewer*, 408 U. S. 471, 485, 489 (1972); *Wolff, supra*, at 563–564; *Goss, supra*, at 581; *Mathews* v. *Eldridge*, 424 U. S. 319, 345–346 (1976); *Cleveland Bd. of Ed.* v. *Loudermill*, 470 U. S. 532, 546 (1985); *Wilkinson*, 545 U. S*.,* at 224; *Hamdi, supra*, at 533 (plurality opinion).

That is so in part because a statement of reasons, even one provided after a visa denial, serves much the same function as a "notice" of a proposed action. It allows Ms. Din, who suffered a "serious loss," a fair "opportunity to meet" "the case" that has produced separation from her husband. See *Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U. S. 123, 171–172 (1951) (Frankfurter, J., concurring); see also *Hamdi, supra*, at 533 (plurality opinion); *Wolff, supra*, at 563; Friendly, *supra*, at 1280 ("notice" must provide "the grounds for" the relevant action). Properly apprised of the grounds for the Government's action, Ms. Din can then take appropriate action—whether this amounts to an appeal, internal agency review, or (as is likely here) an opportunity to submit additional evidence and obtain reconsideration, 22 CFR 42.81(e) (2014).

I recognize that our due process cases often determine

the constitutional insistence upon a particular procedure by balancing, with respect to that procedure, the "private interest" at stake, "the risk of an erroneous deprivation" absent the sought-after protection, and the Government's interest in not providing additional procedure. *Eldridge*, *supra,* at 335; but cf. *Hamdi*, *supra,* at 533 (plurality opinion) (suggesting minimal due process requirements cannot be balanced away). Here "balancing" would not change the result. The "private interest" is important, the risk of an "erroneous deprivation" is significant, and the Government's interest in not providing a reason is normally small, at least administratively speaking. Indeed, Congress requires the State Department to provide a reason for a visa denial in most contexts. 8 U. S. C. §1182(b)(1). Accordingly, in the absence of some highly unusual circumstance (not shown to be present here, see *infra*, at 9), the Constitution requires the Government to provide an adequate reason why it refused to grant Ms. Din's husband a visa. That reason, in my view, could be either the factual basis for the Government's decision or a sufficiently specific statutory subsection that conveys effectively the same information.

## B

### 1

JUSTICE KENNEDY, without denying that Ms. Din was entitled to a reason, believes that she received an adequate reason here. According to the complaint, however, the State Department's denial letter stated only that the visa "had been denied under . . . 8 U. S. C. §1182(a)." App. 30. In response to requests for further explanation, the State Department sent an e-mail stating that the visa "had been denied under . . . 8 U. S. C. §1182 (a)(3)(B)—the terrorism and national security bars to admissibility." *Id.,* at 31. I do not see how either statement could count as adequate.

For one thing, the statutory provision to which it refers, §1182(a)(3)(B), sets forth, not one reason, but dozens. It is a complex provision with 10 different subsections, many of which cross-reference other provisions of law. See Appendix, *infra.* Some parts cover criminal conduct that is particularly serious, such as hijacking aircraft and assassination. §§1182(a)(3)(B)(iii)(I), (IV). Other parts cover activity that, depending on the factual circumstances, cannot easily be labeled "terrorist." One set of cross-referenced subsections, for example, brings within the section's visa prohibition any individual who has "transfer[red] . . . [any] material financial benefit" to "a group of two or more individuals, whether organized or not, which . . . has a subgroup which engages" in "afford[ing] material support . . . for . . . any individual who . . . plans" "[t]he use of any . . . weapon . . . with intent . . . to cause substantial damage to property." §§1182(a)(3)(B)(iv)(VI), (vi)(III), (iv)(VI)(bb), (iii)(V). At the same time, some subsections provide the visa applicant with a defense; others do not. See, *e.g.,* §1182(a)(3)(B)(iv)(VI)(dd) (permitting applicant to show "by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization"). Taken together the subsections, directly or through cross-reference, cover a vast waterfront of human activity potentially benefitting, sometimes in major ways, sometimes hardly at all, sometimes directly, sometimes indirectly, sometimes a few people, sometimes many, sometimes those with strong links, sometimes those with hardly a link, to a loosely or strongly connected group of individuals, which, through many different kinds of actions, might fall within the broad statutorily defined term "terrorist." See, *e.g., Daneshvar* v. *Ashcroft*, 355 F. 3d 615, 628 (CA6 2004) (alleging material support for selling newspapers); *Singh* v. *Wiles*, 747 F. Supp. 2d 1223, 1227 (WD Wash. 2010) (alleging material support for letting individuals

sleep on a temple floor).

For another thing, the State Department's reason did not set forth any factual basis for the Government's decision. Cf., *e.g., Wilkinson*, 545 U. S., at 225–226 (prison administrators must inform prisoners of "factual basis" for extreme solitary confinement). Perhaps the Department denied the visa because Ms. Din's husband at one point was a payroll clerk for the Afghan Government when that government was controlled by the Taliban. See *ante,* at 5 (opinion of KENNEDY, J.). But there is no way to know if that is so.

The generality of the statutory provision cited and the lack of factual support mean that here, the reason given is analogous to telling a criminal defendant only that he is accused of "breaking the law"; telling a property owner only that he cannot build because environmental rules forbid it; or telling a driver only that police pulled him over because he violated traffic laws. As such, the reason given cannot serve its procedural purpose. It does not permit Ms. Din to assess the correctness of the State Department's conclusion; it does not permit her to determine what kinds of facts she might provide in response; and it does not permit her to learn whether, or what kind of, defenses might be available. In short, any "reason" that Ms. Din received is not constitutionally adequate.

2

Seemingly aware that he cannot deny these basic legal principles, JUSTICE KENNEDY rests his conclusions upon two considerations that, in his view, provide sufficient grounds for an exception. *Ante,* at 5–6. Most importantly, he says that ordinary rules of due process must give way here to national security concerns. But just what are those concerns? And how do they apply here? Ms. Din's counsel stated at oral argument that there were no such concerns in this case. Tr. of Oral Arg. 35. And the Solici-

tor General did not deny that statement.

In other cases, such concerns may exist. But, when faced with the need to provide public information without compromising security interests, the Government has found ways to do so, for example, by excising sensitive portions of documents requested by the press, members of the public, or other public officials. See, *e.g.,* 5 U. S. C. §552(b)(1). Moreover, agencies and courts have found ways to conduct proceedings in private, through internal review or *in camera* proceedings, and thereby protect sensitive information. See *Webster* v. *Doe,* 486 U. S. 592, 604 (1988); Brief for Respondent 48–52, and n. 20; Brief for American Civil Liberties Union as *Amicus Curiae* 23–28. Would these (or other) methods prove adequate in other cases where a citizen's freedom to live in America with her spouse is at issue? Are they even necessary here? The Government has not explained.

I do not deny the importance of national security, the need to keep certain related information private, or the need to respect the determinations of the other branches of Government in such matters. But protecting ordinary citizens from arbitrary government action is fundamental. Thus, the presence of security considerations does not suspend the Constitution. *Hamdi*, 542 U. S*.,* at 527–537 (plurality opinion). Rather, it requires us to take security needs into account when determining, for example, what "process" is "due." *Ibid.*

Yet how can we take proper account of security considerations without knowing what they are, without knowing how and why they require modification of traditional due process requirements, and without knowing whether other, less restrictive alternatives are available? How exactly would it harm important security interests to give Ms. Din a better explanation? Is there no way to give Ms. Din such an explanation while also maintaining appropriate secrecy? I believe we need answers to these questions

before we can accept as constitutional a major departure from the procedural requirements that the Due Process Clause ordinarily demands.

JUSTICE KENNEDY also looks for support to the fact that Congress specifically exempted the section here at issue, §1182(a)(3)(B), from the statutory provision requiring the State Department to provide a reason for visa denials. §1182(b)(3). An exception from a statutory demand for a reason, however, is not a command to do the opposite; rather, at most, it leaves open the question whether other law requires a reason. Here that other law is the Constitution, not a statute. In my view, the Due Process Clause requires the Department to provide an adequate reason. And, I believe it has failed to do so.

*    *    *

For these reasons, with respect, I dissent.

APPENDIX

Title 8 U. S. C. § 1182(a)(3) provides:

"**(B) Terrorist activities**

"**(i) In general**

"Any alien who—

"(I) has engaged in a terrorist activity;

"(II) a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv));

"(III) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

"(IV) is a representative (as defined in clause (v)) of—

"(aa) a terrorist organization (as defined in clause (vi)); or

"(bb) a political, social, or other group that endorses or espouses terrorist activity;

"(V) is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);

"(VI) is a member of a terrorist organization described in clause (vi)(III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;

"(VII) endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

"(VIII) has received military-type training (as defined in section 2339D(c)(1) of title 18) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

"(IX) is the spouse or child of an alien who is in-

admissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years,

"is inadmissible. An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this chapter, to be engaged in a terrorist activity.

　"**(ii) Exception**

"Subclause (IX) of clause (i) does not apply to a spouse or child—

"(I) who did not know or should not reasonably have known of the activity causing the alien to be found inadmissible under this section; or

"(II) whom the consular officer or Attorney General has reasonable grounds to believe has renounced the activity causing the alien to be found inadmissible under this section.

　"**(iii) 'Terrorist activity' defined**

"As used in this chapter, the term 'terrorist activity' means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

"(I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

"(II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

"(III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of title 18) or upon the liberty of such a person.

"(IV) An assassination.

"(V) The use of any—

"(a) biological agent, chemical agent, or nuclear weapon or device, or

"(b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),

"with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

"(VI) A threat, attempt, or conspiracy to do any of the foregoing.

### "(iv) 'Engage in terrorist activity' defined

"As used in this chapter, the term 'engage in terrorist activity' means, in an individual capacity or as a member of an organization—

"(I) to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

"(II) to prepare or plan a terrorist activity;

"(III) to gather information on potential targets for terrorist activity;

"(IV) to solicit funds or other things of value for—

"(aa) a terrorist activity;

"(bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;

"(V) to solicit any individual—

"(aa) to engage in conduct otherwise described in this subsection;

"(bb) for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(cc) for membership in a terrorist organization

described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

"(VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training—

"(aa) for the commission of a terrorist activity;

"(bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

"(cc) to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

"(dd) to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

"**(v) 'Representative' defined**

"As used in this paragraph, the term 'representative' includes an officer, official, or spokesman of an organization, and any person who directs, counsels, commands, or induces an organization or its members to engage in terrorist activity.

"**(vi) 'Terrorist organization' defined**

"As used in this section, the term 'terrorist organization' means an organization—

"(I) designated under section 1189 of this title;

"(II) otherwise designated, upon publication in the Federal Register, by the Secretary of State in con-

sultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of clause (iv); or

"(III) that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)."