NIEMEYER, CIRCUIT JUDGE,
with whom JUDGE SHEDD and JUDGE AGEE join, dissenting:
The district court issued a nationwide preliminary injunction against Executive Order No. 13,780 issued by President Donald Trump on March 6, 2017, to suspend temporarily, while vetting procedures could be reviewed, the entry of aliens from six countries, reciting terrorism-related concerns. While the court acknowledged the President’s authority under 8 U.S.C. §§ 1182(f) and 1185(a) to enter the Order and also acknowledged that the national security reasons given on the face of the Order were legitimate, the court refused to apply Kleindienst v. Mandel, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), which held that courts are precluded from “look[ing] behind” “facially legitimate and bona fide” exercises of executive discretion in the immigration context to discern other possible purposes, id. at 770, 92 S.Ct. 2576. Relying on statements made by candidate Trump during the presidential campaign, the district court construed the Executive Order to be directed against Muslims because of their religion and held therefore that it likely violated the Establishment Clause of the First Amendment.
I conclude that the district court seriously erred (1) by refusing to apply the Supreme Court’s decision in Mandel; (2) by fabricating a new proposition of law— indeed, a new rule—that provides for the consideration of campaign statements to recast a later-issued executive order; and (3) by radically extending Supreme Court Establishment Clause precedents. The district court’s approach is not only unprecedented, it is totally unworkable and inappropriate under any standard of analysis.
The majority reworks the district court’s analysis by applying Mandel, albeit contrary to its holding, to defer only to the facial legitimacy of the Order but not to its facial bona fides, despite the Mandel Court’s holding that “when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests” of the plaintiffs. Mandel, 408 U.S. at 770, 92 S.Ct. 2576 (emphasis added). In addition, the majority, after violating Mandel, then adopts the same new rule of law adopted by the district court to consider candidate Trump’s campaign statements to find the Executive Order’s stated reasons “pretext[ual],” ante at 591, and then to rewrite the Order to find it in violation of the Establishment Clause. This too is unprecedented and unworkable.
Accordingly, I respectfully dissent. I would vacate the district court’s injunction.
I
A
The Immigration and Nationality Act, 8 U.S.C. §§ 1101 et seq., requires that an alien, to obtain admission into the United States, must normally both possess a visa and be admissible upon his or her arrival at a port of entry, id. §§ 1181, 1182(a)(7), 1201(h).
Exceptions exist which allow for entry without a visa. For instance, Congress has established a Visa Waiver Program, which allows nationals of certain countries to seek temporary admission into the United States for 90 days or less. 8 U.S.C. § 1187. In December 2015, however, Congress excluded aliens from admission under this *640 program who are dual nationals of or have recently visited Iraq, Syria, any country designated by the Secretary of State to be a state sponsor of international terrorism, or any country that the Secretary of Homeland Security has deemed to be a country or area of concern. Pub. L. No. 114-113, div. 0, tit. II, § 203, 129 Stat. 2988, 2989-91 (2015) (codified at 8 U.S.C. § 1187(a)(12)). At all times relevant to this litigation, the countries designated by the Secretary of State to be state sponsors of international terrorism have been Iran, Sudan, and Syria. U.S. Dep’t of State, Country Reports on Terrorism 2015, at 4, 299-302 (June 2016), https://perma.cc/KJ4 B-E4QZ. Also, in February 2016, the Department of Homeland Security (“DHS”) excluded recent visitors to and nationals of Libya, Somalia, and Yemen from the Program. DHS, DHS Announces Further Travel Restrictions for the Visa Waiver Program (Feb. 18, 2016), https://perma.cc/ 87CZ-L4FU.
Even when an alien possesses a visa, the alien must also be admissible to the United States when arriving at a port of entry. Congress has accorded the President broad discretion over the admission of aliens, providing in 8 U.S.C. § 1182(f):
Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.
In addition, Congress has specified that the entry of aliens is governed by “such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.” Id. § 1185(a)(1).
B
On January 27, 2017, the President issued Executive Order 13,769, 89 Fed. Reg. 8977, which was challenged in several courts. A district court in Washington enjoined nationally the enforcement of several provisions of that order, see Washington v. Trump, No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017), and the Ninth Circuit declined to stay the district court’s injunction pending appeal, Washington v. Trump, 847 F.3d 1151 (9th Cir. 2017) (per curiam).
Rather than challenge that decision further, the President issued a revised order—Executive Order 13,780—on March 6, 2017, entitled, “Protecting the Nation From Foreign Terrorist Entry Into the United States,” 82 Fed. Reg. 13,209, which is the Order before us. This Order revoked the earlier order and rendered moot the challenge to the earlier order.
The first Section of the revised Executive Order announces the policy goals of “protecting] the Nation from terrorist activities by foreign nationals” by “improving] the screening and vetting protocols and procedures associated with the visa-issuance process and the [United States Refugee Admissions Program]” that “play a crucial role in detecting foreign nationals who may commit, aid, or support acts of terrorism and in preventing those individuals from entering the United States.” Order Preamble, § 1(a).
The Order then recites the previous Administration’s response to terrorist activities in the countries covered by the current Order:
Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen ... had [during the prior Administration] already been identified as presenting heightened concerns about *641 terrorism and travel to the United States.... [And] [i]n 2016, the Secretary of Homeland Security designated Libya, Somalia, and Yemen as additional countries of concern for travel purposes, based on consideration of ... statutory factors related to terrorism and national security.... Additionally, Members of Congress have expressed concerns about screening and vetting procedures following recent terrorist attacks in this country and in Europe.
Order § 1(b)(i). Describing further the threats posed generally by these nations, the Order states:
Nationals from the countries previously identified ... warrant additional scrutiny in connection with our immigration policies because the conditions in these countries present heightened threats. Each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones. Any of these circumstances diminishes the foreign government’s willingness or ability to share or validate important information about individuals seeking to travel to the United States. Moreover, the significant presence in each of these countries of terrorist organizations, their members, and others exposed to those organizations increases the chance that conditions will be exploited to enable terrorist operatives or sympathizers to travel to the United States.
Order § 1(d). Finally, the Order describes as follows “the conditions in six of the previously designated countries that demonstrate why their nationals continue to present heightened risks to the security of the United States,” relying on the Department of State’s Country Reports of Terrorism 2015:
(i) Iran. Iran has been designated as a state sponsor of terrorism since 1984 and continues to support various terrorist groups, including Hizballah, Hamas, and ... al Qa’ida.... Iran does not cooperate with the United States in counterterrorism efforts.
(ii) Libya. Libya is an active combat zone.... In many parts of the country, security and law enforcement functions are provided by armed militias rather than state institutions. Violent extremist groups, including the Islamic State of Iraq and Syria (ISIS), have exploited these conditions to expand their presence in the country.... The United States Embassy in Libya suspended its operations in 2014.
(iii) Somalia. Portions of Somalia have been terrorist safe havens. Al-Shabaab, an al-Qa’ida—affiliated terrorist group, has operated in the country for years and continues to plan and mount operations within Somalia and in neighboring countries. Somalia has porous borders, and most countries do not recognize Somali identity documents....
(iv) Sudan. Sudan has been designated as a state sponsor of terrorism since 1993 because of its support for international terrorist groups, including Hizbal-lah and Hamas ... [and it] provided safe havens for al-Qa’ida and other terrorist groups to meet and train.... [Elements of core al-Qa’ida and ISIS-linked terrorist groups remain active in the country.
(v) Syria. Syria has been designated as a state sponsor of terrorism since 1979. [Although] [t]he Syrian government is engaged in an ongoing military conflict against ISIS[,] ... ISIS continues to attract foreign fighters to Syria and to use its base in Syria to plot or encourage attacks around the globe, including in the United States. The United States Embassy in Syria suspended its operations in 2012. Syria does not cooperate *642 with the United States’ counterterrorism efforts.
(vi) Yemen. ... Both ISIS and a second group, al-Qa’ida in the Arabian Peninsula (AQAP), have exploited [internal] conflict to expand their presence in Yemen and to carry out hundreds of attacks. Weapons and other materials smuggled across Yemen’s porous borders are used to finance AQAP and other terrorist activities. In 2015, the United States Embassy in Yemen suspended its operations ....
Order § 1(e). Based on this collection of information, the Order concludes that, “[i]n light of the conditions in these six countries, until [an] assessment of current screening and vetting procedures ... is completed, the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high.” Order § 1(f).
The operative provisions, as relevant here, are stated in Section 2 of the Order, which directs the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, to “conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat.” Order § 2(a). The Secretary of Homeland Security is then directed to present a report with his findings to the President. Order § 2(b). And finally, pending the review, the Order prohibits the entry of certain nationals from the six countries, as follows:
To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and in light of the national security concerns referenced in section 1 of this order, I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. § 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States. I therefore direct that the entry into the United States of nationals of those six countries be suspended for 90 days from the effective date of this order, subject to the limitations, waivers, and exceptions set forth in sections 3 and 12 of this order.
Order § 2(c).
The referenced limitations in Section 3 specify that the suspension does not apply to nationals of the designated countries who are inside the United States on the effective date of the Order (March 16, 2017) or who had a valid visa at 5:00 p.m. on January 27, 2017 or on the effective date of the Order. Order § 3(a). The Section goes on to create exceptions that allow the entry of lawful permanent residents of the United States, foreign nationals with valid travel documents that are not visas, dual nationals traveling on passports issued by a non-designated country, foreign nationals traveling on diplomatic visas, foreign nationals granted asylum, refugees already admitted to the United States, and any individual who has been granted withholding of removal, advance parole, or protection under the Convention Against Torture. Order § 3(b). Finally, Section 3 *643 allows consular officers or the Commissioner of U.S. Customs and Border Protection to “decide on a case-by-case basis to authorize the issuance of a visa to, or to permit the entry of, a foreign national for whom entry is otherwise suspended if the foreign national has demonstrated to the officer’s satisfaction that denying entry during the suspension period would cause undue hardship, and that his or her entry would not pose a threat to national security and would be in the national interest.” Order § 3(c).
In sum, nationals of the designated countries who lack visas were, prior to the Order, unable to enter the United States under the Visa Waiver Program, 8 U.S.C. § 1187. Nationals who possess visas are exempted from the Order, as are most other nationals who have the ability to enter the United States through another travel document. See Order §§ 2, 3. The Order thus affects nationals of the designated countries who, lacking visas, were already unable to enter the United States but who had hoped to obtain a visa and to enter the United States within the 90 day period of the Order.[1]
C
The plaintiffs are three organizations and six individuals. Two of the organizations, the International Refugee Assistance Project (“IRAP”) and HIAS, Inc., provide legal assistance and aid to refugees, while the third organization, the Middle East Studies Association (“MESA”), is an organization of students and scholars of Middle Eastern studies. The six individual plaintiffs are U.S. citizens or lawful permanent residents who alleged that the Order would prevent or delay foreign-national family members from entering the United States.
On March 10, 2017, after Executive Order 13,780 was issued but before it went into effect, the plaintiffs filed their operative complaint, as well as a motion for a preliminary injunction to enjoin enforcement of the Order. They alleged, as relevant here, that the Order violates the Establishment Clause of the First Amendment and 8 U.S.C. § 1152(a), which prohibits discrimination based on nationality in issuing immigrant visas. After expedited briefing and argument, the district court entered a nationwide preliminary injunction that barred enforcement of Section 2(c) of the Order.
The district court began its analysis by concluding that at least three of the individual plaintiffs hád standing.
On the merits, the court concluded that the plaintiffs were likely to succeed on their claim that the Order violated the Establishment Clause. Although the court acknowledged that “the Second Executive Order is facially neutral in terms of religion” and that “national security interests would be served by the travel ban,” it nonetheless looked behind the Order to statements made during the presidential campaign by candidate Trump and concluded, based on these statements, that the Order was likely motivated by anti-Muslim animus. In looking behind the Order, the court refused to apply Mandel, stating as its reason that Mandel applied to the review of decisions by immigration officers denying visas and “does not apply to the promulgation of a sweeping immigration policy at the highest levels of the political branches.”
*644 The district court also found that the plaintiffs were likely to succeed on a small portion of their statutory claim, concluding that the Order conflicted with federal law insofar as it had “the specific effect of halting the issuance of [immigrant] visas to nationals of the Designated Countries.” Otherwise, it found that “an executive order barring entry to the United States based on nationality pursuant to the President’s authority under § 1182(f) [did] not appear to run afoul of the provision in § 1152(a) barring discrimination in the issuance of immigrant visas.” (Internal quotation marks omitted).
From the entry of the preliminary injunction, the government filed this appeal.
II
In affirming the district court’s ruling based on the Establishment Clause, the majority looks past the face of the Order’s statements on national security and immigration, which it concedes are neutral in terms of religion, and considers campaign statements made by candidate Trump to conclude that the Order denigrates Islam, in violation of the Establishment Clause. This approach (1) plainly violates the Supreme Court’s directive in Mandel; (2) adopts a new rule of law that uses campaign statements to recast the plain, unambiguous, and religiously neutral text of an executive order; and (3) radically extends the Supreme Court’s Establishment Clause holdings. I address these legal errors in turn.
A
I begin with the majority’s failure faithfully to apply Mandel.
In Mandel, Ernest Mandel, a Belgian citizen, was denied a nonimmigrant visa to enter the United States to participate in conferences and to give speeches. In denying his admission to the United States, the Attorney General relied on 8 U.S.C. §§ 1182(a)(28)(D), (G)(v) and 1182(d)(3)(A), which provided that aliens who advocate or publish “the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship” shall be excluded from admission to the United States unless granted a waiver by the Attorney General. Mandel admitted that he was a Marxist who advocated the economic, governmental, and international doctrines of world communism, and the Attorney General refused to grant him a waiver. Mandel, 408 U.S. at 756, 759, 92 S.Ct. 2576. University professors in the United States, who had invited Mandel to the United States to speak, as well as Mandel himself, filed an action challenging the constitutionality of the relevant statutory provisions and the Attorney General’s exercise of his authority under those provisions. Id. at 759-60, 92 S.Ct. 2576. They alleged that the relevant statutory provisions and the Attorney General’s denial of a waiver were unconstitutional because they deprived the American plaintiffs of their First Amendment rights to hear and meet with Mandel. Id. at 760, 92 S.Ct. 2576.
Despite its conclusion that the professors’ First Amendment rights were well-established, the Supreme Court held that Mandel’s exclusion was lawful. At the outset, the Court explicitly accepted that Mandel’s exclusion implicated the First Amendment. It found, however, that its “Recognition that First Amendment rights are implicated ... [was] not dispositive of [its] inquiry.” Mandel, 408 U.S. at 765, 92 S.Ct. 2576. The Court stated that, based on “ancient principles of the international law of nation-states,” Congress could categorically bar those who advocated Communism from entry, explaining that “the power to exclude aliens is inherent in *645 sovereignty, necessary for maintaining normal international relations, and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government.” Id. The Court repeated Justice Harlan’s holding that the government’s power “to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications.” Id. at 766, 92 S.Ct. 2576 (quoting Lem Moon Sing v. United States, 158 U.S. 538, 547, 15 S.Ct. 967, 39 L.Ed. 1082 (1895)).
The Court then rejected the argument that the Attorney General’s denial of a waiver violated the First Amendment. The Court forbade judges from interfering with the executive’s “facially legitimate and bona fide” exercise of its immigration authority or balancing that exercise against constitutional rights. Mandel, 408 U.S. at 770, 92 S.Ct. 2576. Specifically, it recognized that “Congress has delegated conditional exercise of this power [of exclusion] to the Executive” and declined to apply more scrutiny to executive exercise of that power than it would to Congress’s own actions. Id. It concluded:
We hold that when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant.
Id. (emphasis added).
The holding of Mandel ineluctably requires that we vacate the district court’s preliminary injunction. The similarities between Mandel and this case are numerous and significant. In both cases, Congress delegated power to the executive to prohibit the entry of a certain class of foreign nationals. 8 U.S.C. § 1182(a)(,28)(D), (d)(3)(A) (1970); 8 U.S.C. § 1182(f) (2016). The plaintiffs in each case challenged the executive’s exercise of that statutory discretion as violative of their individual First Amendment rights. The court in Mandel rejected this challenge because, even assuming a constitutional violation lurked beneath the surface of the executive’s implementation of his statutory authority, the reasons the executive had provided were “facially legitimate and bona fide.” We must thus reject this similar challenge today.
The Court has consistently reaffirmed and applied Mandel’s holding. In Fiallo v. Bell, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), the Court declined to scrutinize a statute that gave different immigration status to a child born out of wedlock depending on whether it was the child’s mother or father who was a citizen or lawful permanent resident. Although that statute involved two suspect classifications—gender and legitimacy—the Court, citing Mandel, nonetheless concluded that “it is not the judicial role in cases of this sort to probe and test the justifications” of immigration policies. Id. at 799, 97 S.Ct. 1473. Accordingly, in response to the plaintiffs’ arguments that the distinction was based “on an overbroad and outdated stereotype,” the Court indicated that “this argument should be addressed to the Congress rather than the courts.” Id. at 799 n.9, 97 S.Ct. 1473.
And both Mandel and Fiallo were reaffirmed more recently in Justice Kennedy’s opinion in Kerry v. Din, — U.S. —, 135 S.Ct. 2128, 2139, 192 L.Ed.2d 183 (2015) (Kennedy, J., concurring in the judgment). In Din, the Court considered a suit by a *646 United States citizen who alleged that the government deprived her of a liberty interest protected under the Due Process Clause by denying her husband’s visa application without adequate explanation, providing only a citation to the provision under which the visa was denied. Justice Kennedy, writing for himself and Justice Alito to provide the fourth and fifth votes in favor of the government, stated that “[t]he reasoning and the holding in Man-del control here” and that the reasoning of Mandel “has particular force in the area of national security.” Id. at 2140. He concluded that “respect for the political branches’ broad power over the creation and administration of the immigration system” meant that, because the government had provided Din with a facially legitimate and bona fide reason for its action, Din had no viable constitutional claim. Id. at 2141.
The plaintiffs can provide no coherent basis for their assertion that this case is not controlled by Mandel and its progeny. They do argue that the holding of Mandel does not apply to claims under the Establishment Clause, but they are unable to point to any case in which the Supreme Court has ever suggested the existence of such a limitation, or, indeed, any case in which it has suggested that some areas of law are not governed by the rule laid out in Mandel. Absent such a case, we are not now at liberty to craft—out of whole cloth—exceptions to controlling Supreme Court precedents.
To reach its conclusion, the majority does not adopt the plaintiffs’ broad argument that Mandel does not even apply. Instead, in its attempt to escape Mandel’s clear holding, it asserts that “[w]here plaintiffs have seriously called into question whether the stated reason for the challenged action was provided in good faith,” the court may “step away from our deferential posture and look behind the stated reason for the challenged action” to attempt to discern the action’s purpose. Ante at 591. This approach, which totally undermines Mandel, is the foundation of its new rule that campaign statements may be considered to recast an unambiguous, later-adopted executive order on immigration. The majority states that even though the Order is on its face legitimate and provides reasons rooted in national security, because the plaintiffs “have more than plausibly alleged” bad faith, “we no longer defer” to the Order’s stated purpose “and instead may ‘look behind’ [the Order]” in an attempt to discern whether the national security reason was in fact provided as a pretext for its religious purpose. Ante at 592. This approach casually dismisses Mandel, Fiallo, and Din.
If the majority’s understanding had been shared by the Supreme Court, it would have compelled different results in each of Mandel, Fiallo, and Din, as in each of those cases the plaintiffs alleged bad faith with at least as much particularity as do the plaintiffs here. In Mandel, the allegations were such that Justice Marshall, writing in dissent, observed that “[e]ven the briefest peek behind the Attorney General’s reason for refusing a waiver in this case would reveal that it is a sham.” Id. at 778, 92 S.Ct. 2576 (Marshall, J., dissenting). In Fiallo, Justice Marshall, again writing in dissent, pointed to the fact that the statute in question relied on “invidious classifications.” Fiallo, 430 U.S. at 810, 97 S.Ct. 1473 (Marshall, J., dissenting). And in Din, the plaintiffs argued that the consular decision should be reviewed because it fell within the “limited circumstances where the government provides no reason, or where the reason on its face is illegitimate.” Brief for Respondent at 31, Din, 135 S.Ct. 2128 (No. 13-1402), 2015 WL 179409. But, as those cases hold, a lack of good faith must appear on the face *647 of the government’s action, not from looking behind it.
As support for its dramatic departure from Supreme Court precedent, the majority relies on a scattershot string of quotations drawn out of context from one sentence in Din. The carelessness of the majority’s presentation is demonstrated simply by a comparison of its characterization of Din and the actual language of Din taken in context. Here is how the majority characterizes Din:
Justice Kennedy explained that where a plaintiff makes “an affirmative showing of bad faith” that is “plausibly alleged with sufficient particularity,” courts may “look behind” the challenged action to assess its “facially legitimate” justification.
Ante at 590. And here is what Justice Kennedy in Din actually said, with the language quoted by the majority in bold:
Absent an affirmative showing of bad faith on the part of the consular officer who denied Berashk a visa—which Din has not plausibly alleged with sufficient particularity—Mandel instructs us not to “look behind” the Government’s exclusion of Berashk for additional factual details beyond what its express reliance on § 1182(a)(3)(B) encompassed.
Din, 135 S.Ct. at 2141 (emphasis added).
More problematic is the majority’s misunderstanding of Din’s actual holding, which the majority tries to reshape for its own ends. In Din, when the plaintiff refused to accept the curt explanation of why her husband was denied a visa, she claimed that due process required that the government disclose the factual basis for its determination. Faced with Din’s request for these underlying facts, the Supreme Court declined, instead applying Mandel’s requirement that the plaintiff must show that the government’s reasons were not facially legitimate and not facially bona fide. As Justice Kennedy explained:
Din claims due process requires she be provided with the facts underlying this determination, arguing Mandel required a similar factual basis.
[[Image here]]
Din perhaps more easily could mount a challenge to her husband’s visa denial if she knew the specific subsection on which the consular office relied.
* * *
[But] the notice given was constitutionally adequate, particularly in light of the national security concerns the terrorism bar addresses. [Citing Fiallo, 430 U.S. at 795-96 [97 S.Ct. 1473]]. And even if Din is correct that sensitive facts could be reviewed by courts in camera, the dangers and difficulties of handling such delicate security material further counsel against requiring disclosure in a case such as this.
[[Image here]]
For these reasons, my conclusion is that the Government satisfied any obligation it might have had to provide Din with a facially legitimate and bona fide reason for its action when it provided notice that her husband was denied admission to the country under § 1182(a)(3)(B). By requiring the Government to provide more, the Court of Appeals erred in adjudicating Din’s constitutional claims.
Din, 135 S.Ct. at 2140-41 (Kennedy, J., concurring in judgment) (emphasis added) (citations omitted). Nowhere did the Din Court authorize going behind the government’s notice for the purpose of showing bad faith. The plaintiff had to show facially that the notice was in bad faith, i.e., not bona fide. The majority’s selective quotations from Din, which conceal Din’s faithful application of Mandel, are *648 simply misleading. Indeed, the impetus for the majority’s approach is revealed when it states, “If we limited our purpose inquiry to review of the operation of a facially neutral order, we would be caught in an analytical loop, where the order would always survive scrutiny.” Ante at 597 (emphasis added). That consequence—that facially neutral executive orders survive review—is precisely what Mandel requires.
In looking behind the face of the government’s action for facts to show the alleged bad faith, rather than looking for bad faith on the face of the executive action itself, the majority grants itself the power to conduct an extratextual search for evidence suggesting bad faith, which is exactly what three Supreme Court opinions have prohibited. Mandel, Fiallo, and Din have for decades been entirely clear that courts are not free to look behind these sorts of exercises of executive discretion in search of circumstantial evidence of alleged bad faith. The majority, now for the first time, rejects these holdings in favor of its politically desired outcome.
B
Considering the Order on its face, as we are required to do by Mandel, Fiallo, and Din, it is entirely without constitutional fault. The Order was a valid exercise of the President’s authority under 8 U.S.C. §§ 1182(f) and 1185(a) to suspend the entry of “any aliens” or “any class of aliens” and to prescribe “reasonable rules, regulations, and orders” regarding entry, so long as the President finds that the aliens’ admission would be “detrimental to the interests of the United States.” And Executive Order No. 13,780 was not the first to be issued under this authority. Such orders were entered by Presidents Reagan, George H.W. Bush, Clinton, George W. Bush, and Obama.[2] Moreover, the particular reasons given for the issuance of the Executive Order respond directly to the described risk of terrorism from six countries, justifying the imposition of a 90-day pause in the admission of nationals from those countries while the Administration determines whether existing screening and vetting procedures are adequate.
The Executive Order begins by noting that the previous Administration, in conjunction with Congress, identified seven countries—Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen—“as presenting heightened concerns about terrorism and travel to the United States,” specifically noting that the previous Administration’s Secretary of Homeland Security designated Libya, Somalia, and Yemen as countries of concern for travel purposes based on terrorism and national security. Order § l(b)(i). And finally it notes that Members of Congress had expressed concerns about “screening and vetting procedures” following terrorist attacks in 2016 in Europe, as well as in this country. Id.
Adding to the historical assessment of those risks, the Executive Order continues with its conclusions, based on additional data, that the conditions in the countries previously identified had worsened, at least with respect to six of the seven countries (excepting Iraq), noting that some of those countries were state sponsors of ter *649 rorism or were significantly compromised by terrorist organizations. Several of the countries were unwilling or unable to share or validate information about nationals seeking to travel to the United States, and in some, the conditions increasingly enabled “terrorist operatives or sympathizers to travel to the United States.” Order § 1(d).
Finally, the Order addresses the particular circumstances of each of the six countries covered by the Order, noting for example, that Iran, Sudan, and Syria were state sponsors of terrorism; that the governments in Libya, Somalia, and Syria were rendered partially or entirely unable to resist terrorist organizations because of the organizations’ activities; and that Iran, Libya, Syria, and Yemen either were not cooperating with the United States in its counterterrorism efforts or were unable to do so.
None of the facts or conditions recited as reasons for the issuance of the Executive Order have been challenged as untrue or illegitimate. Indeed, the plaintiffs conceded during oral argument that if another candidate had won the presidential election in November 2016 and thereafter entered this same Executive Order, they would have had no problem with the Order. As counsel for the plaintiffs stated, “I think in that case [the Order] could be constitutional.” Similarly, the district court found the face of the Order to be neutral in terms of religion. And the majority too so concludes. Ante at 591-92, 595.
Moreover, these reasons amply support the modest action taken by the Executive Order, which imposes only a temporary pause of 90 days to assess whether the screening and vetting procedures that are applied to nationals from these high-risk countries are adequate to identify and exclude terrorists. Even this pause is accompanied by an authorization to issue waivers designed to limit any harmful impact without compromising national security.
While the legitimate justifications for the Order are thoroughly established, its supposed ills are nowhere present on its face. Far from containing the sort of religious advocacy or disparagement that can violate the Establishment Clause, the Order contains no reference to religion whatsoever. Nor is there any trace of discriminatory animus. In short, under Mandel and its progeny, Executive Order 13,780 comfortably survives our review.[3]
C
The majority’s new rule, which considers statements made by candidate Trump during the presidential campaign to conclude that the Executive Order does not mean what it says, is fraught with danger and impracticability. Apart from violating all established rules for construing unambiguous texts—whether statutes, regulations, executive orders, or, indeed, contracts— reliance on campaign statements to impose a new meaning on an unambiguous Executive Order is completely strange to judicial analysis.
The Supreme Court has repeatedly warned against “judicial psychoanalysis of a drafter’s heart of hearts.” McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 862, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). And consistent with *650 that warning, the Court has never, “in evaluating the legality of executive action, deferred to comments made by such officials to the media.” Hamdan v. Rumsfeld, 548 U.S. 557, 623-24 n.52, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). The Court’s reluctance to consider statements made in the course of campaigning derives from good sense and a recognition of the pitfalls that would accompany such an inquiry.
Because of their nature, campaign statements are unbounded resources by which to find intent of various kinds. They are often short-hand for larger ideas; they are explained, modified, retracted, and amplified as they are repeated and as new circumstances and arguments arise. And they are often ambiguous. A court applying the majority’s new rule could thus have free reign to select whichever expression of a candidate’s developing ideas best supports its desired conclusion.
Moreover, opening the door to the use of campaign statements to inform the text of later executive orders has no rational limit. If a court, dredging through the myriad remarks of a campaign, fails to find material to produce the desired outcome, what stops it from probing deeper to find statements from a previous campaign, or from a previous business conference, or from college?
And how would use of such statements take into account intervening acts, events, and influences? When a candidate wins the election to the presidency, he takes an oath of office to abide by the Constitution and the laws of the Nation; he appoints officers of the government and retains ad-visors, usually specialized in their field. Is there not the possibility that a candidate might have different intentions than a President in office? And after taking office, a President faces new external events that may prompt new approaches altogether. How would a court assess the effect of these intervening events on presidential intent without conducting judicial psychoanalysis?
The foibles of such a rule are unbounded and its adoption would have serious implications for the democratic process. As Judge Kozinski said well when he wrote about the Ninth Circuit’s use of the same campaign .statements:
Even if a politician’s past statements were utterly clear and consistent, using them to yield a specific constitutional violation would suggest an absurd result—namely, that the policies of an elected official can be forever held hostage by the unguarded declarations of a candidate. If a court were to find that campaign skeletons prevented an official from pursuing otherwise constitutional policies, what could he do to cure the defect? Could he stand up and recant it all (“just kidding!”) and try again? Or would we also need a court to police the sincerity of that mea culpa—piercing into the public official’s “heart of hearts” to divine whether he really changed his mind, just as the Supreme Court has warned us not to? See McCreary, 545 U.S. at 862 [125 S.Ct. 2722],
Washington v. Trump, No. 17-35105 (9th Cir. March 17, 2017) (Kozinski, J., dissenting from the denial of reconsideration en banc).
The danger of the majority’s new rule is that it will enable any court to justify its decision to strike down any executive action with which it disagrees. It need only find one statement that contradicts the stated reasons for a subsequent executive action and thereby pronounce that reasons for the executive action are a pretext. This, I submit, is precisely what the majority opinion does.
Moreover, the unbounded nature of the majority’s new rule will leave the Presi *651 dent and his Administration in a clearly untenable position for future action. It is undeniable that President Trump will need to engage in foreign policy regarding majority-Muslim nations, including those designated by the Order. And yet the majority now suggests that at least some of those future actions might also be subject to the same challenges upheld today. Presumably, the majority does not intend entirely to stop the President from creating policies that address these nations, but it gives the President no guidelines for “cleansing” himself of the “taint” they have purportedly identified.
Finally, the new rule would by itself chill political speech directed at voters seeking to make their election decision. It is hard to imagine a greater or more direct chill on campaign speech than the knowledge that any statement made may be used later to support the inference of some nefarious intent when official actions are inevitably subjected to legal challenges. Indeed, the majority does not even deny that it employs an approach that will limit communication to voters. Instead, it[1] simply opines remarkably that such chilling is “a welcome restraint.” Ante at 600.
The Supreme Court surely will shudder at the majority’s adoption of this new rule that has no limits or bounds—one that transforms the majority’s criticisms of a candidate’s various campaign statements into a constitutional violation.
D
Finally, it is readily apparent that the plaintiffs’ attempt to use campaign stater ments to transform a facially neutral executive action into an Establishment Clause violation would, in any event, be unlikely to succeed on the merits.
The thrust of the plaintiffs’ argument, which the majority adopts, is that the Order violates the Establishment Clause’s requirement of religious neutrality because it was enacted “primarily for the purpose of targeting Muslims.” To be sure, courts must ensure that government action is indeed motivated by a secular, rather than religious, purpose. See Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). And while the government’s “stated reasons” for an action “will generally get deference,” it is true that “the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective.” McCreary, 545 U.S. at 864, 125 S.Ct. 2722. “The eyes that look to purpose belong to an ‘objective observer,’ one who takes account of the traditional external signs that show up in the ‘text, legislative history, and implementation of the statute,’ or comparable official act.” Id. at 862, 125 S.Ct. 2722 (quoting Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000)).
But these generic standards are all of the doctrinal support that the plaintiffs and the majority can muster. For one, the Supreme Court has never applied the Establishment Clause to matters of national security and foreign affairs. And of the few government actions that the Supreme Court has invalidated based on a religious purpose, McCreary, 545 U.S. at 859, 125 S.Ct. 2722 (remarking that the Court had “found government action motivated by an illegitimate purpose only four times since Lemon”), each is manifestly distinguishable from the Order here.
First, for all of the weight that the majority places on McCreary, it ignores that the Court there confronted a facially religious government action—the display of the Ten Commandments in two county courthouses. The Court in McCreary thus began with a presumption that the display was intended to promote religion. See 545 *652 U.S. at 867-69, 125 S.Ct. 2722. When it examined the legislative history surrounding the displays, it did so only to reject the government’s attempt to overcome that presumption with a secular, pedagogical purpose—a purpose that the Court declined to accept because it was adopted “only as a litigating position,” id. at 871, 125 S.Ct. 2722, “without a new resolution or repeal of the old [and expressly religious] one,” id. at 870, 125 S.Ct. 2722; see also Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 223-24, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (holding that schools’ policy of required Bible study and recitation of the Lord’s Prayer violated Establishment Clause). In stark contrast, the district court here concluded, and the majority agrees, that nothing on the face of the Executive Order speaks to religion. Ante at 595-96. Under McCreary, we should therefore begin with the presumption that the Order is neutral toward religion.
To be sure, the Supreme Court in “unusual cases” will find a religious purpose even where the government action contains no facial reference to religion. McCreary, 545 U.S. at 865, 125 S.Ct. 2722. The majority, quoting selectively from these cases, invokes them to justify its searching inquiry into whether the Order’s secular justifications were subordinate to a religious purpose that it has gleaned only from' extrinsic statements. The majority’s approach, however, in no way accords with what the Court actually did in those cases. In each case, the Court found the government action inexplicable but for a religious purpose, and it looked to extrinsic evidence only to confirm its suspicion, prompted by the face of the action, that it had religious origins. See Santa Fe, 530 U.S. at 315-16, 120 S.Ct. 2266 (invalidating school policy of allowing student-led “invocation” before football games because the policy’s language and context showed that religious prayer was the “preferred message”); Edwards v. Aguillard, 482 U.S. 578, 585-86, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (invalidating state law that required creationism to be taught with evolution because the law did nothing to accomplish its stated secular purpose of “protect[ing] academic freedom”); Wallace v. Jaffree, 472 U.S. 38, 56-61, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (invalidating state law that provided for one minute of “meditation or voluntary prayer” at the start of each school day because bill’s sponsor stated that sole purpose was to encourage school prayer and prior statute already provided for student meditation).
The Executive Order in this case fits nowhere within this line. It is framed and enforced without reference to religion, and the government’s proffered national security justifications, which are consistent with the stated purposes of the Order, withstand scrutiny. Conflicting extrinsic statements made prior to the Order’s enactment surely cannot supplant its facially, legitimate national security purpose. See McCreary, 545 U.S. at 865, 125 S.Ct. 2722 (“[T]he Court often ... accept[s] governmental statements of purpose, in keeping with the respect owed in the first instance to such official claims”); Mueller v. Allen, 463 U.S. 388, 394-95, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (referring to the Court’s “reluctance to attribute unconstitutional motives to the states, particularly when a plausible secular purpose for the state’s program may be discerned from the face of the statute”). Indeed, to hold otherwise would fly in the face of the Court’s decisions upholding government actions with connections to religion far more obvious than those here. See Lynch v. Donnelly, 465 U.S. 668, 681, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (city’s inclusion of creche in Christmas display justified by “legitimate secular purposes,” namely “to *653 celebrate the Holiday and to depict the origins of that Holiday”); McGowan v. Maryland, 366 U.S. 420, 444-46, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (upholding state’s requirement that businesses be closed on Sundays because, while Sunday laws had obvious religious origins, their religious purpose had dissipated in favor of a secular one).
The decision in Board of Education of Kiryas Joel Village School District v. Grumet, 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994), on which the majority also relies, is similarly inapposite. The state law at issue in that case “carved out” a new school district that included only “a religious enclave of Satmar Hasidism, practitioners of a strict form of Judaism.” Id. at 690, 114 S.Ct. 2481. In Kiryas Joel, however, the government did not dispute that the lines were drawn with religion in mind. Id. at 699, 114 S.Ct. 2481. Rather than searching for extrinsic statements as evidence of a religious purpose, the Court took the government at its word and treated as corroborative of its religious purpose the fact that “the district’s creation ran uniquely counter to state practice.” Id. at 702, 114 S.Ct. 2481; see also id. at 729, 114 S.Ct. 2481 (Kennedy, J., concurring in the judgment) (“There is no serious question that the legislature configured the school district, with purpose and precision, along a religious line. This explicit religious gerrymandering violates the First Amendment Establishment Clause” (emphasis added)).
The government here, by contrast, provides ample nonreligious justification for the Order and actively contests that it has any religious purpose. Far from running “counter” to typical national security practice, each of the Order’s six affected countries was previously designated as “a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones.” Order § 1(d). And an Order that affects all nationals of six countries, irrespective of their religion, is not so precisely hewn to religious lines that we can infer, based on its operation alone, a predominantly religious purpose.
Undeterred, the majority, pursuing its objective despite the costs, opens Lemon's already controversial purpose inquiry even wider.[4] It engages in its own review of the national security justifications supporting the Order and concludes that protecting national security could not be the President’s “primary purpose.” As evidence, the majority points to the President’s level of consultation with national security agencies before issuing the Order; the content of internal Department of Homeland Security reports; the comments of former national security officials made in an amicus brief; and its own assessment of the national security threats described in the Order. Ante at 595-97.
This intense, factual scrutiny of a facially legitimate purpose, of course, flies in the face of Mandel, Fiallo, and Din. But even *654 within traditional Establishment Clause doctrine, it is an unprecedented overreach. It goes far beyond the Court’s inquiry in McCreary, where the government offered a secular “litigating position” for & facially religious action, 545 U.S. at 871, 125 S.Ct. 2722, or in Wallace, where the government’s proffered secular purpose for a statute that provided for “meditation or voluntary prayer” was belied by the fact that a previous law already provided for a minute of meditation, 472 U.S. at 59-61, 105 S.Ct. 2479 (finding that the bill’s “sole purpose” was religious). In those cases, the Court concluded that the government’s secular purpose did not hold up even on its own terms—that is, even accepting the soundness of the secular purpose, undisputed historical facts made clear that the secular purpose was not primary. The Court emphatically did not, however, question the factual bases underlying the government’s proffered secular purpose.
The majority’s intense factual inquiry is particularly inappropriate where the government’s secular purpose is related to national security—a subject, as the majority recognizes, on which we owe the executive significant deference. See Holder v. Humanitarian Law Project, 561 U.S. 1, 33-34, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (explaining that, where the executive had concluded that material support to terrorist organizations “will ultimately inure to the benefit of their criminal, terrorist functions,” “[t]hat evaluation of the facts by the Executive ... is entitled to deference” because it “implicates sensitive and weighty interests of national security and foreign affairs”).
Unless corrected by the Supreme Court, the majority’s new approach, which is unsupported by any Supreme Court case, will become a sword for plaintiffs to challenge facially neutral government actions, particularly those affecting regions dominated by a single religion. Government officials will avoid speaking about religion, even privately, lest a court discover statements that could be used to ascribe a religious motivation to their future actions. And, in the more immediate future, our courts will be faced with the unworkable task of determining when this President’s supposed religious motive has sufficiently dissipated so as to allow executive action toward these or other majority-Muslim countries. The Establishment Clause demands none of these unfortunate and unprecedented results.
[[Image here]]
For all of the foregoing reasons, I would reject the plaintiffs’ and the district court’s Establishment Clause arguments and vacate the district court’s injunction.

. Other portions of the Order, not at issue here, suspend adjudication of applications under the Refugee Program for 120 days, subject to case-by-case waivers, and limit to 50,-000 the number of refugees admitted in fiscal year 2017. Order § 6(a)—(c).

. See, e.g., Exec. Order 12,324, 46 Fed. Reg. 48,109 (Sept. 29, 1981) (Reagan); Proclamation 5,517, 51 Fed. Reg. 30,470 (Aug. 22, 1986) (Reagan); Exec. Order 12,807, 57 Fed. Reg. 23,133 (May 24, 1992) (George H.W. Bush); Proclamation 6,958, 61 Fed. Reg. 60,-007 (Nov. 22, 1996) (Clinton); Proclamation 7,359, 65 Fed. Reg. 60,831 (Oct. 10, 2000) (Clinton); Executive Order 13,276, 67 Fed. Reg. 69,985 (Nov. 15, 2002) (George W. Bush); Exec. Order 13,692, 80 Fed. Reg. 12,-747 (Mar. 8, 2015) (Obama); Exec. Order 13,726, 81 Fed. Reg. 23,559 (Apr. 19, 2016) (Obama).

. The opinions in support of affirmance betray an object beyond a disciplined analysis. Judge Gregory states, for example, that the Executive Order "drips with religious intolerance, animus, and discrimination,” ante at 572, and Judge Wynn states similarly, “this Executive Order is no more than ... naked invidious discrimination against Muslims,” ante at 612. These statements flatly mischar-acterize an order that undisputedly contains no facial reference to religion.

. While there is no question that it binds us, Lemon’s test, and particularly its inquiry into government purpose, has repeatedly been criticized as open-ended and manipulable. See McCreary, 545 U.S. at 902, 125 S.Ct. 2722 (Scalia, J., dissenting) ("By shifting the focus of Lemon's purpose prong from the search for a genuine, secular motivation to the hunt for a predominantly religious purpose, the Court converts what has in the past been a fairly limited inquiry into a rigorous review of the full record”); see also, e.g., Santa Fe, 530 U.S. at 319-20, 120 S.Ct. 2266 (Rehnquist, C.J., dissenting); Kiryas Joel, 512 U.S. at 720, 114 S.Ct. 2481 (O'Connor, J., concurring in part and concurring in the judgment); Cty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 655-57, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (Kennedy, J., concurring in the judgment in part and dissenting in part). Should the majority not be wary of jumping when on thin ice?

. Though I fully join Judge Niemeyer's and Judge Agee’s well-reasoned dissenting opinions, I offer the following additional comments to explain why I believe the district court further abused its discretion in entering the preliminary injunction. Judge Niemeyer and Judge Agee have authorized me to state that they join in this dissenting opinion.