In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1205

MOSHIN YAFAI and ZAHOOR AHMED,

*Plaintiffs-Appellants*,

*v.*

MIKE POMPEO, Secretary of State, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-09728 — **Sara L. Ellis**, *Judge*.

ARGUED SEPTEMBER 7, 2018 — DECIDED JANUARY 4, 2019

Before FLAUM, RIPPLE, and BARRETT, *Circuit Judges*.

BARRETT, *Circuit Judge*. A consular officer twice denied the
visa application of Zahoor Ahmed, a citizen of Yemen, on the
ground that she had sought to smuggle two children into the
United States. Ahmed and her husband Moshin Yafai—a
United States citizen—filed suit challenging the officer's
decision. But the decision is facially legitimate and bona fide,
so the district court correctly dismissed the plaintiffs'

challenge to it under the doctrine of consular nonreviewability.

## I.

Moshin Yafai and Zahoor Ahmed were born, raised, and married in Yemen. Yafai became a naturalized United States citizen in 2001. After receiving his citizenship, Yafai filed I-130 petitions with the U.S. Citizenship and Immigration Service of the Department of Homeland Security on behalf of his wife and several of their children. The I-130 petitions—which, if granted, would permit them to apply for immigrant visas—were approved. Ahmed and her children subsequently applied for visas.

But the consular officer denied Ahmed's visa application.[1] The officer based the denial on attempted smuggling under 8 U.S.C. § 1182(a)(6)(E), which provides that "[a]ny alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible." The denial stated: "You attempted to smuggle two children into the United States using the identities Yaqub Mohsin Yafai and Khaled Mohsin Yafai."

Yafai and Ahmed told the embassy that Yaqub and Khaled were their children, both of whom had tragically drowned. Although it is not entirely clear from either the record or the plaintiffs' brief, their position seems to have been that Ahmed could not be guilty of smuggling, because the children whom she had allegedly smuggled were deceased. In response, the

---

[1] The record does not reveal the name of the consular officer (or officers) who worked on Ahmed's case, so we refer to this person (or persons) throughout as "the consular officer" or "the officer."

consular officer requested additional documents about the children so that the officer could reconsider Ahmed's application. The officer requested (and Ahmed provided) seven types of documents: (1) vaccination records; (2) Khaled's school records; (3) hospital bills; (4) hospital birth records; (5) the police report from the drowning accident; (6) Khaled's passport; and (7) family photos.

After providing the documents, the plaintiffs' attorney contacted the consular office to request an update on the matter. An embassy fraud prevention manager working on Ahmed's case responded by email. The email stated:

> We acknowledge that there has been some repetition in examining the circumstances of the purported deaths of two beneficiaries, but we note that your clients do not testify credibly, testify contradictorily, deny the existence of evidence, and otherwise cast doubt on the accuracy of their responses. Hence they were questioned by the interviewing officer who referred their cases to the Fraud Prevention Unit whereupon we explored the same issues in more detail with you[r] clients. Based on their testimony, we concluded the evidence which you attached did exist, hence we requested its production in an effort to corroborate the testimony of your clients, not impeach it. As of this writing, a fraud investigator is reviewing the evidence and we will finalize our fraud report for the adjudicating officer.

Several months after this email was sent, the consular officer reaffirmed the prior visa denial for attempted smuggling under § 1182(a)(6)(E).[2]

Yafai and Ahmed subsequently filed suit challenging the denial under the Declaratory Judgment Act and the Administrative Procedure Act. They argued that the consular officer acted in bad faith by ignoring evidence that Yaqub and Khaled were their children and that they were deceased. The district court dismissed the claims under the doctrine of consular nonreviewability.

## II.

Congress has delegated the power to determine who may enter the country to the Executive Branch, and courts generally have no authority to second-guess the Executive's decisions. *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972). To that end, the doctrine of consular nonreviewability "bars judicial review of visa decisions made by consular officials

---

[2] The record before us does not include additional detail on the rationale behind the consular officer's decision. It does not show, for example, whether the officer concluded that Ahmed and Yafai did not have children named Yaqub and Khaled; whether the officer thought that Ahmed had tried to smuggle children into the United States using the names of children who were hers but who were now deceased; or whether the officer believed that Ahmed had children named Yaqub and Khaled whom she had tried to smuggle into the United States while they were still alive. If Ahmed tried to smuggle her own children into the United States, she could seek a waiver of the statutory bar. *See* 8 U.S.C. § 1182(d)(11) (giving the Attorney General the discretion to waive the bar if "the alien seeking admission … encouraged, induced, assisted, abetted, or aided only an individual who at the time of such action was the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law"). She has apparently not done so.

abroad." *Matushkina v. Nielsen*, 877 F.3d 289, 294 (7th Cir. 2017). The Supreme Court has identified a limited exception to this doctrine, however, when the visa denial implicates a constitutional right of an American citizen. *Mandel*, 408 U.S. at 769–70; *see Morfin v. Tillerson*, 851 F.3d 710, 711 (7th Cir. 2017). Yet even in that circumstance, a court may not disturb the consular officer's decision if the reason given is "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769.

The plaintiffs invoke this limited exception to the doctrine of consular nonreviewability on the ground that denying Ahmed a visa implicates one of Yafai's constitutional rights: his right to live in America with his spouse. The status of this right is uncertain. In *Kerry v. Din*, a plurality of the Supreme Court said that no such right exists, 135 S. Ct. 2128, 2131 (2015) (plurality opinion), and if we were to adopt the plurality's reasoning, our analysis would end here. But we have avoided taking a position on this issue in the past, *see, e.g.*, *Hazama v. Tillerson*, 851 F.3d 706, 709 (7th Cir. 2017), and we need not do so now. Even if the denial of Ahmed's visa application implicated a constitutional right of Yafai's, his claim fails because the consular officer's decision was facially legitimate and bona fide.

For a consular officer's decision to be facially legitimate and bona fide, the consular officer must identify (1) a valid statute of inadmissibility and (2) the necessary "discrete factual predicates" under the statute. *See Din*, 135 S. Ct. at 2140–41 (Kennedy, J., concurring). When a statute "specifies discrete factual predicates that the consular officer must find to exist before denying a visa," the citation of the statutory predicates is itself sufficient. *Id.* at 2141. In other words, the consular officer need not disclose the underlying facts that led

him to conclude that the statute was satisfied. *Id.* ("*Mandel* instructs us not to 'look behind' the Government's exclusion of [the alien spouse] for additional factual details beyond what its express reliance on [the relevant statutory provision] encompassed.") (citing *Mandel*, 408 U.S. at 770)); *see also Morfin*, 851 F.3d at 713–14 (explaining that citation to the statutory requirements supplies a legitimate reason for denying a visa application).

Here, the officer provided a facially legitimate and bona fide reason for denying Ahmed's application. He cited a valid statutory basis: 8 U.S.C. § 1182(a)(6)(E). And he provided the factual predicate for his decision: "You attempted to smuggle two children into the United States using the identities Yaqub Mohsin Yafai and Khaled Mohsin Yafai." No more was required, and under *Mandel*, we cannot "look behind the exercise of that discretion." 408 U.S. at 770.[3]

---

[3] The dissent acknowledges that precedent requires nothing more than the consular officer's assertion of a facially legitimate and bona fide reason. *See* Dissenting Op. at 10. Yet the dissent would add another hurdle: proof that the officer adequately considered the evidence in the visa application. According to the dissent, "we [] have the obligation to require, at the very least, that the Government assure us, by affidavit or similar evidence, that it actually took into consideration the evidence presented by the applicant and point to some factual support for the consular officer's decision to discount that evidence." *Id.* at 15–16. That proposition contradicts the Supreme Court's holding in *Mandel*. *See* 408 U.S. at 770. As we discuss in the next Part, a court might be able to look behind an apparently legitimate and bona fide decision when the plaintiff advances affirmative evidence of bad faith. But that would be a narrow exception—precedent clearly forecloses the dissent's position that we are authorized to demand more from the government as a matter of course.

III.

Yafai and Ahmed argue for an exception to *Mandel*'s limited exception of consular nonreviewability. They contend that a court must engage in more searching review of a facially legitimate and bona fide decision if the plaintiffs make an affirmative showing that the decision was made in bad faith. And Yafai and Ahmed claim that they have made such a showing: they assert that the evidence they produced was strong, and the officer did not accept it. That, they say, demonstrates that the officer acted in bad faith.

It is unclear how much latitude—if any—courts have to look behind a decision that is facially legitimate and bona fide to determine whether it was actually made in bad faith. In *Mandel*, the Court refused to look behind a facially legitimate and bona fide decision over the dissent's vigorous objection that "[e]ven the briefest peek behind [it] … would reveal that it is a sham." 408 U.S. at 778 (Marshall, J., dissenting). Yet Justice Kennedy's concurrence in *Din* observes that an "affirmative showing of bad faith" that is "plausibly alleged with sufficient particularity" might justify more searching review, 135 S. Ct. at 2141, and we have, at least in dicta, allowed for the same possibility, *see Morfin*, 851 F.3d at 713–14 ("Perhaps the refusal to issue Ulloa a visa could be said to lack a 'facially legitimate and bona fide reason' … if the consular official had concluded that the indictment's charges were false, or if Ulloa had presented strong evidence of innocence that the consular officer refused to consider."). Yafai and Ahmed might be right, therefore, that evidence of behind-the-scenes bad faith can overcome *Mandel*'s rule that courts must stick to the face of the visa denial in evaluating it.

That exception would not benefit the plaintiffs here, however, because they have failed to make "an affirmative showing" that the officer denied Ahmed's visa in bad faith. *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring). The plaintiffs contend that the only conclusion that an honest officer could draw from reviewing their evidence is that Ahmed qualified for a visa. But the fact that the officer did not believe Ahmed and Yafai's evidence does not mean that the officer was dishonest or had an illicit motive. *See Bad Faith*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining bad faith as "[d]ishonesty of belief, purpose, or motive"). The officer could have honestly concluded that Ahmed and Yafai's testimony was not credible and that the documents they provided did not substantiate it. *Cf. Bustamante v. Mukasey*, 531 F.3d 1059, 1062–63 (9th Cir. 2008) (stating that to establish bad faith, a plaintiff must "allege that the consular official did not in good faith believe the information he had"). Making an "affirmative showing of bad faith" requires a plaintiff to point to something more than an unfavorable decision.

While it is not necessary for the Secretary of State to rebut Yafai and Ahmed's allegation of bad faith, we note that the evidence here reflects a good-faith evaluation of Ahmed's application. The officer asked Ahmed to submit additional documents so that the consulate could reconsider her visa application. A request for additional documents is inconsistent with the plaintiffs' allegation that the officer ignored evidence in bad faith; on the contrary, the officer's willingness to reconsider Ahmed's application in light of additional evidence suggests a desire to get it right. And the embassy officer's email to the plaintiffs' lawyer reveals good-faith reasons for rejecting the plaintiffs' response to the smuggling charge. It details concerns about the plaintiffs'

credibility and contradictory testimony—concerns that cut directly against their argument that the officer acted insincerely in rejecting Ahmed's visa application.

\* \* \*

The consular officer's decision to reject Ahmed's visa application was facially legitimate and bona fide, and the plaintiffs have made no affirmative showing that the officer acted in bad faith. Thus, the district court correctly dismissed the plaintiffs' claims, which were asserted under both the Administrative Procedure Act and the Declaratory Judgment Act. *See Morfin*, 851 F.3d at 714 (dismissing claim under the APA because doctrine of consular nonreviewability applies); *Matushkina*, 877 F.3d at 295 (stating that "[c]ourts have applied the doctrine of consular nonreviewability even to suits where a plaintiff seeks to challenge a visa decision indirectly"). The judgment of the district court is AFFIRMED.

RIPPLE, *Circuit Judge*, dissenting. Mohshin Yafai, a United States citizen, brought this action in the district court, alleging that a consular officer's decision to deny his wife an immigrant visa violates his right to due process of law. He submits that the officer, without any evidentiary support and with substantial evidence to the contrary, invented a theory that his wife had attempted to smuggle two children into the United States. My colleagues interpret the judicially created doctrine of consular non-reviewability to dictate dismissal of such a claim. I respectfully dissent because I believe that their view of the doctrine sweeps more broadly than required by the Supreme Court and our own precedent, and deprives Mr. Yafai of an important constitutional right.

**A.**

The first issue we must address is whether Mr. Yafai can maintain an action seeking redress for the denial of his wife's visa application. This step requires that we determine whether Mr. Yafai has any cognizable interest in his wife's application. In earlier cases, following Justice Kennedy's separate opinion in *Kerry v. Din*, 135 S. Ct. 2128, 2139 (2015) (Kennedy, J., concurring in judgment), we have assumed, without deciding, that a United States citizen has a protected interest in a spouse's visa application. *See, e.g.*, *Hazama v. Tillerson*, 851 F.3d 706, 709 (7th Cir. 2017). My colleagues continue to follow this path. Because I would grant relief on the merits, I cannot simply assume such a liberty interest. I must decide the issue.

In my view, a citizen does have a cognizable liberty interest in a spouse's visa application. The Supreme Court certainly implied that a citizen can have a cognizable interest in an alien's visa application in *Kleindienst v. Mandel*, 408 U.S.

753, 762–65 (1972) (suggesting American professors who sought Mandel's participation in a variety of conferences had a First Amendment interest in his presence and, therefore, his visa application). In *Din*, 135 S. Ct. at 2142–43 (Breyer, J., dissenting), the four dissenting justices specifically agreed that a United States citizen has an interest in an alien spouse's visa application. The three justices in the plurality, however, took the opposite view. *Id.* at 2131 (Scalia, J.) (plurality opinion). They noted that a couple is "free to live … anywhere in the world that both individuals are permitted to reside" and that Congress has plenary power to regulate immigration, which it has exercised in its "long practice of regulating spousal immigration." *Id.* at 2135–36, 2138.

Justice Breyer's perspective is far more compatible with the values of our constitutional tradition. A citizen's right to live in this Country is protected under the Due Process Clause. *See, e.g.*, *Baumgartner v. United States*, 322 U.S. 665, 670 (1944); *Ng Fung Ho v. White*, 259 U.S. 276, 284–85 (1922). At the same time, our Nation's constitutional tradition values the institution of marriage highly, as it is "fundamental to our very existence and survival." *Loving v. Virginia*, 388 U.S. 1, 12 (1967).[1] Consequently, the Supreme Court has long

---

[1] *Loving v. Virginia*, 388 U.S. 1 (1967), illustrates the issue here. The Lovings were an interracial couple legally married in the District of Columbia. *Id.* at 2. When they moved home to Virginia, they were prosecuted for violating a state miscegenation law. *Id.* at 2–3. Instead of sentencing them to prison, the state judge suspended the sentence on the condition that they did not return to Virginia for twenty-five years. *Id.* at 3. The Lovings, however, wished to return to Virginia and challenged the law. *Id.* The Court's holding that the statute violated the Lovings' right to marriage implies that "the option to live with one's spouse in a different

(continued … )

recognized the importance of family and the principle that marriage includes the right of spouses to live together and raise a family. *See, e.g., Obergefell v. Hodges,* 135 S. Ct. 2584, 2590–2601 (2015); *Zablocki v. Redhail*, 434 U.S. 374, 384–86 (1978); *Moore v. City of East Cleveland*, 431 U.S. 494, 500–04 (1977) (plurality opinion); *Griswold v. Connecticut*, 381 U.S. 479, 485–86 (1965); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). Indeed, the right to conceive and to raise one's children has been deemed an "essential, basic civil right[] of man."[2] *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (citation and internal quotation marks omitted). The interests of parents in their children "is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (O'Connor, J.) (plurality opinion).

---

( … continued)

state did not cure the state's infringement on their right to marriage." Beth Caldwell, *Deported by Marriage: Americans Forced to Choose Between Love and Country*, 82 Brooklyn L. Rev. 1, 21 (2016). Similarly, the option for a United States citizen to live abroad with his spouse does not cure the infringement on his right to marriage by an unfair denial of the noncitizen spouse's entry into this Country.

[2] Although the United States has signed but not ratified the U.N. Convention on the Rights of the Child, the Convention makes evident the importance of retaining the family unit, especially considering the importance of a parent to her children. United Nations Convention on the Rights of the Child, Sept. 2, 1990, 1577 U.N.T.S. 3. Undoubtedly, the separation of family can affect the physical and mental well-being of the child, both presently and in his or her future development. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2600 (2015) (noting that marriage "affords the permanency and stability important to children's best interests").

It is incongruous to maintain, therefore, that a United States citizen does not have any interest in a spouse's presence in the Country and that the only recourse open to a citizen if the government denies a spouse entry is to leave the United States. Although Congress certainly can regulate spousal immigration and deny entry for good and sufficient reason, an American citizen has a liberty interest in living with his or her spouse. This interest requires that any exclusion of a citizen's spouse be imposed fairly and evenhandedly.[3]

Mr. Yafai, a United States citizen, therefore has a constitutionally protected interest in Ms. Ahmed's presence in the United States. This interest is secured by ensuring that our Government's consular officials evaluate fairly her visa ap-

---

[3] In the removal context, we have said that "family members of illegal aliens have no cognizable interest in preventing an alien's exclusion and deportation." *Oforji v. Ashcroft*, 354 F.3d 609, 618 (7th Cir. 2003); *see also De Figueroa v. I.N.S.*, 501 F.2d 191, 195 (7th Cir. 1974). Other circuits have made similar determinations. *See Garcia v. Boldin*, 691 F.2d 1172, 1183 (5th Cir. 1982); *Burrafato v. U.S. Dep't of State*, 523 F.2d 554, 555 (2d Cir. 1975); *Cervantes v. I.N.S.*, 510 F.2d 89, 91–92 (10th Cir. 1975); *Swartz v. Rogers*, 254 F.2d 338, 339 (D.C. Cir. 1958). *But see Silverman v. Rogers*, 437 F.2d 102, 107 (1st Cir. 1970) (acknowledging, albeit obliquely, and pre-*Mandel*, the interest of an American citizen spouse in obtaining a visa upon expiration of the original visa but holding that the Government can require a party to a marriage leave the United States). These cases, however, involved deportation proceedings where the alien family member attempted to enter or did enter the country illegally, or committed a crime necessitating their deportation pursuant to the statute. Here, on the other hand, a spouse of a United States citizen is seeking to enter the country legally.

plication. What constitutes a fair evaluation is the question to which I now turn.

**B.**

In delineating the protections afforded citizens who sponsor an immigrant spouse's application for entry into the United States, we must begin, of course, with the unquestioned principle that Congress has plenary responsibility to regulate immigration into the United States. U.S. Const. art. I, § 8, cl. 4. In fulfilling that responsibility, Congress has enacted a prolix code that delegates a great deal of authority to the executive branch. *See* 8 U.S.C. § 1101 *et seq.* That delegation sets forth the distinctions and standards that Congress has deemed appropriate in administering entry into the United States. *See* 8 U.S.C. § 1182. We must not forget, however, that Congress also has given the judiciary the limited, but important, responsibility to ensure that the Executive administers the immigration process according to the standards enacted by Congress. The Immigration and Nationality Act explicitly sets forth when a court may not review the discretionary denial of a visa. *See*, *e.g.*, 8 U.S.C. § 1182(a)(10)(C). The Act does not expressly preclude review of visa denials under the smuggling provision in 8 U.S.C. § 1182(a)(6)(E). *Cf.* 8 U.S.C. § 1252 (providing judicial review for orders of removal); *Dhakal v. Sessions*, 895 F.3d 532, 538 (7th Cir. 2018) (noting jurisdiction to review the denial of an asylum claim without a removal order because, "[a]lthough the APA is not an independent grant of jurisdiction, where federal jurisdiction is not precluded by another statute, general federal question jurisdiction exists under 28 U.S.C. § 1331" (citations omitted)).

In the course of fulfilling its responsibilities, the Judiciary has fashioned a consular non-reviewability doctrine. As a judge-made doctrine, it must be crafted and implemented in a manner compatible with the congressional mandate. The Supreme Court's decision in *Kleindienst v. Mandel*, 408 U.S. 753 (1972), is the starting point for understanding this doctrine. There, the Supreme Court held that "when the Executive exercises" the delegated and plenary congressional power to make policies and rules for the exclusions of aliens "negatively on the basis of a *facially legitimate and bona fide reason*, the courts will [not] look behind the exercise of that discretion … ." *Id.* at 770 (emphasis added). In that case, Ernest Mandel, the plaintiff and a Belgian national, was invited to attend a variety of academic conferences in the United States and to speak about his communist views. *Id.* at 756–57. His visa application was denied under a statutory provision that excluded from admission to the United States aliens who advocated for communism. *Id.* at 756. The Government further stated that Mandel had not received a discretionary waiver because he had not followed his itinerary during a previous visit to the country. *Id.* at 758–59. The Court held that, because "the Attorney General [had] inform[ed] Mandel's counsel of the reason for refusing his client a waiver," and because "that reason was facially legitimate and bona fide," further judicial review was unwarranted. *Id.* at 769. The Court noted that the "plenary congressional power to make policies and rules for exclusion of aliens has long been firmly established." *Id.* at 769–70. Therefore, the Court reasoned that "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the appli-

cant." *Id.* at 770. Notably, in *Mandel*, there was no contention that the Government had not considered Mandel's arguments. Rather, his sponsors sought judicial review of the merits of the underlying decision of immigration authorities: they contended that the official had not weighed properly First Amendment considerations in denying the waiver.

The Supreme Court addressed the consular non-reviewability doctrine again in *Kerry v. Din*, 135 S. Ct. 2128 (2015). In that case, the Government denied a spouse's application for a visa under a statutory provision providing that an alien would be inadmissible if he participated in any of eight enumerated types of terrorist activity. *See* 8 U.S.C. § 1182(a)(3)(B). There was no opinion for the Court, but Justice Kennedy, in his concurrence, explored *Mandel*'s requirement of a facially legitimate and bona fide reason for a visa denial.[4] He concluded "that the Government satisfied any obligation it might have had to provide Din with a facially legitimate and bona fide reason for its action when it provided notice that her husband was denied admission to

---

[4] Justice Kennedy was joined by Justice Alito. *Kerry v. Din*, 135 S. Ct. 2128, 2139–41 (2015) (Kennedy, J., concurring in judgment). The plurality, authored by Justice Scalia and joined by Chief Justice Roberts and Justice Thomas, did not reach the question of consular non-reviewability because, in their view, Din was not deprived of "life, liberty, or property" when the government denied her husband's visa. *Id.* at 2131–38 (Scalia, J.) (plurality opinion). Justice Breyer's dissent, joined by Justices Ginsburg, Sotomayor, and Kagan, found that Din did have a protected interest in her husband's visa and that there must be some factual basis for the denial of that visa. *Id.* at 2141–47 (Breyer, J., dissenting).

the country under § 1182(a)(3)(B)."[5] *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in judgment). In his view, citing the terrorism provision, 8 U.S.C. § 1182(a)(3)(B), constituted sufficient explanation of the consular officer's reason for denying Din's husband a visa. *Id*. at 2140–41. Justice Kennedy determined that the Government did not have to point to which of the eight enumerated types of terrorist activity in § 1182(a)(3)(B) applied or to provide facts underlying its determination, in part because the statute expressly did not require the Government to do so. *Id.* at 2141; *see also* 8 U.S.C. § 1182(b)(3) (exempting individuals denied admission under the terrorism-related provisions from the statutory notice requirement). Under these circumstances, citation to a statute that itself "specifies discrete factual predicates" was enough to provide a facially legitimate and bona fide reason for the visa denial. *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in judgment). That said, Justice Kennedy went on to note that Din's husband worked for the Taliban government, which "provides at least a facial connection to terrorist activity." *Id*. Therefore, "[a]bsent an affirmative showing of bad faith on the part of the consular officer … which Din has not plausibly alleged with sufficient particularity—*Mandel* instructs us not to 'look behind' the Government's exclusion of [Din's husband] for additional factual details beyond what its express reliance on § 1182(a)(3)(B) encompassed." *Id.*

---

[5] Justice Kennedy assumed, without deciding, that Din, an American citizen, had a sufficient liberty interest in the visa application of her alien spouse to receive due process protection. *Id.* at 2139 (Kennedy, J., concurring in judgment).

In our own cases, we have attempted to apply the teachings of the Supreme Court in *Mandel* and *Din*.[6] We have observed that no opinion in *Din* garnered a majority, and that *Mandel* must control our decision. *Morfin v. Tillerson*, 851 F.3d 710, 713 (7th Cir. 2017) ("[*Din*] left things as *Mandel* had left them—and the opinion in *Mandel* spoke for a majority of the Court, sparing us the need to determine how to identify the controlling view in *Din* given that the concurring opinion is not a logical subset of the lead opinion (or the reverse). *Mandel* tells us not to go behind a facially legitimate and bona fide explanation." (citation omitted)).[7] Accordingly, we

---

[6] *See Hazama v. Tillerson*, 851 F.3d 706, 709 (7th Cir. 2017) (considering, without citing Justice Kennedy's *Din* concurrence, the possibility of bad faith and finding that "there is nothing in this record to suggest that the consular officers were proceeding in bad faith").

[7] In *Marks v. United States*, 430 U.S. 188 (1977), the Supreme Court held that, in the case of a fragmented decision, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Id.* at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). We have declined to apply *Marks* where a concurrence that provides the fifth vote does not provide a "common denominator" for the judgment. *See*, *e.g.*, *Schindler v. Clerk of Circuit Court*, 715 F.2d 341, 345 n.5 (7th Cir. 1983). Although Justice Kennedy may find support for a bad faith exception from the dissenters, this is not a common denominator for *the judgment*. Further, although it is plausible that the plurality would agree that the denial still stands when the consular officer cites a statute, there is no common denominator between the plurality and Justice Kennedy's concurrence. The plurality does not reach the question of whether a facially legitimate and bona fide basis is satisfied by the assertion of a statutory ground; rather, Justice Scalia finds no process is due because Din does not have a protectable interest in her husband's visa. Justice Kennedy, on the other hand, as-

(continued … )

must accept the legitimacy of a "facially legitimate and bona fide" reason. We cannot "look behind" the stated reason, nor can we test its validity by second-guessing the Executive's weighing of various factors.

While demonstrating our careful adherence to the teaching of *Mandel*, our recent cases also suggest the inherent limitations of the consular privilege. Properly understood, the Supreme Court's cases permit the judiciary to fulfill its congressionally mandated responsibilities. In each of our recent cases, we simply have determined that the Government asserted a facially legitimate and bona fide reason for exclusion by citing the statutory basis for the denial. In *Morfin*, 851 F.3d at 713, the consular officer cited the statute disqualifying for admission any alien who the consular officer has reason to believe is or has been a drug trafficker. Further, in *Hazama v. Tillerson*, 851 F.3d 706, 709 (7th Cir. 2017), we refused to go beyond the statutory ground cited and "recharacteriz[e]" a consular officer's determination that the visa applicant committed an act of terrorism by throwing rocks at Israeli soldiers as a thirteen-year-old boy. Finally, in *Matushkina v. Nielsen*, 877 F.3d 289, 295–96 (7th Cir. 2017), we found a consular officer's citation to the fraud and misrepresentation statute to be a facially legitimate and bona fide reason for the visa denial.

In each case, however, we also went past the statutory citations and took notice of the evidence supporting the stated ground for inadmissibility. *See Morfin*, 851 F.3d at 713 (not-

---

( … continued)

sumes, without deciding, that Din has a protectable interest, but that process was satisfied.

ing an indictment for drug trafficking supported the statutory requirement that the consular officer have "reason to believe" the alien is or has been a drug trafficker); *Hazama*, 851 F.3d at 709 ("The consular officer in Jerusalem knew several things before making his decision: first, this particular act of rock-throwing took place in one of the least settled places in the world … ; second, rocks are not benign objects … ; third, Ghneim did not deny that he had thrown the rocks; and fourth, Ghneim had several other blots on his record."); *Matushkina*, 877 F.3d at 296 ("Matushkina acknowledged in the interview that she omitted information about her daughter's employment."). In short, we made certain that the assertion by the consular officer was not made of whole cloth. As we put it in *Morfin*, 851 F.3d at 713, we assured ourselves that "the State Department was [not] imagining things." *See Hazama*, 851 F.3d at 709 ("All we can do is to look at the face of the decision, see if the officer cited a proper ground under the statute, and ensure that no other applicable constitutional limitations are violated. Once that is done, *if the undisputed record includes facts that would support that ground,* our task is over." (emphasis added)); *Morfin*, 851 F.3d at 713–14 ("Perhaps the refusal to issue Ulloa a visa could be said to lack a 'facially legitimate and bona fide reason' (in *Mandel*'s words) if the consular official had concluded that the indictment's charges were false, or *if Ulloa had presented strong evidence of innocence that the consular officer refused to consider.* But neither his complaint nor his appellate brief makes such an argument." (emphasis added)).

Notably, in each of these cases, while assuring ourselves that consular officers stayed within the bounds of their authority, we never attempted to review the substantive merits of interpretive and discretionary decisions that they made.

Indeed, in *Hazama*, 851 F.3d at 709, we accepted the consular official's determination that throwing rocks at Israeli soldiers as a thirteen-year-old boy constituted terrorist acts. We have made certain that there were bona fide facts present that provided some basis for the Department's assertion of the ground for exclusion. *See id.*; *Morfin*, 851 F.3d at 713; *Matushkina*, 877 F.3d at 295–96. We did not weigh the facts; we did not question the consular officer's characterization of the facts. We simply noted, to prevent arbitrariness, that the record contained some basis for the officer's decision. In none of these cases were we confronted with an allegation that the consular official had proceeded in bad faith. Nevertheless, we acknowledged that such an allegation, if plausibly made, would present a very different situation. We recognized that our statutory duty would require that we not look the other way. For instance, in *Morfin*, we acknowledged that a visa denial may lack a facially legitimate and bona fide reason if the applicant "had presented strong evidence of innocence that the consular officer refused to consider." 851 F.3d at 713–14. In *Hazama*, 851 F.3d at 709, we acknowledged specifically the possibility that a case might raise serious allegations of bad faith.

## C.

Today's case raises the concern of fundamental fairness that we previously acknowledged would fall outside the comparatively straightforward situations in *Mandel*, *Din*, and our earlier cases. Here, the evidence submitted by Mr. Yafai raises the distinct possibility that the consular officer, contrary to his representations made to Mr. Yafai's counsel, never considered the evidence submitted. Mr. Yafai, a citizen of the United States, wanted his family to come and live with him

in this Country. He was successful in securing passports for those of his children who were born after he was naturalized and visas for those who were born earlier. An adult daughter, already married, stayed in Yemen. The consular officer denied a visa for his wife, Ms. Ahmed, under 8 U.S.C. § 1182(a)(6)(E) ("Any alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of the law is inadmissible."). The denial included a single laconic statement that Ms. Ahmed violated the smuggling provision in § 1182(a)(6)(E): "You attempted to smuggle two children into the United States using the identities Yaqub Mohsin Yafai and Khaled Mohsin Yafai."[8]

According to Mr. Yafai, while the family's applications were pending, two of the children had drowned accidentally. When the consular officials inexplicably denied Ms. Ahmed's application apparently on the ground that the two deceased children were not her own, the family submitted a substantial amount of evidence to overcome the accusation of fraud. That evidence included vaccination records for the deceased children, school records for the older deceased child, prenatal care and ultrasound records, publications concerning the drowning, a passport for the older deceased child, and complete family photos prior to the children's deaths.[9] The consular office responded with another denial, which merely cited the immigration smuggling pro-

---

[8] R.1-1 at 21.

[9] *See* R.1.

vision in § 1182(a)(6)(E).[10] To this day, we have no idea what the basis was, or if there was any basis, for the Government's assertion that Ms. Ahmed attempted to smuggle two children into the United States. On this record, we cannot tell whether the adjudicating officer undertook a careful examination or whether, without any examination, he simply issued a denial based solely on a generalized, stereotypical assumption of what, in his view, happens in that country.

This case is, therefore, precisely the unusual case that has made some of the Justices and our own court hesitate to sanction an ironclad, judge-made rule admitting of no exceptions. Here, in a case where the Government asserts no national security interest and where the important familial rights of an American citizen are at stake, the Government asks us to rubber stamp the consular decision on the basis of a conclusory assertion. Although Congress has tasked us, by statute, with the responsibility to prevent arbitrary and capricious government action, we look the other way despite the significant record evidence to refute the Government's assertion and no suggestion that the consular officer even considered it.[11] Granted, we have no authority to *assess* the

---

[10] R.1-1 at 22.

[11] In an email on October 16, 2014 to Ms. Ahmed and Mr. Yafai's attorney, a Fraud Prevention Manager acknowledged the receipt of evidence from Mr. Yafai and indicated that some review may have been undertaken:

> *Thank you for the attachments. They will be most useful in our analysis.*

> Rest assured that there is no delay in the processing of this case to conclusion. We acknowledge that there has been

(continued … )

evidence, but under the statute, we do have the obligation to require, at the very least, that the Government assure us, by

---

( … continued)

> some repetition in examining the circumstances of the purported deaths of the two beneficiaries, but we note that your clients do not testify credibly, testify contradictorily, deny the existence of evidence, and otherwise cast doubt on the accuracy of their responses. Hence, they were questioned by the interviewing officer who referred their cases to the Fraud Prevention Unit whereupon we explored the same issues in more detail with you[r] clients. *Based on their testimony, we concluded that the evidence which you attached did exist, hence requested its production in an effort to corroborate the testimony of your clients, not impeach it.*
>
> *As of this writing, a fraud investigator is reviewing the evidence and will finalize our fraud report for the adjudicating officer.* Unfortunately, Embassy Sanaa is currently on ordered departure and there are no IV adjudicating officers remaining at post. We are operating at 70% staff reduction occasioned by civil unrest. *Your clients' case will be placed in the queue for an officer's review upon their return to post.*

R. 1-1. at 26–28 (emphases added). This email provides no information on the later treatment of the evidence by the adjudicating officer. It only indicates that the Embassy received the evidence that Mr. Yafai submitted to rebut claims of smuggling and fraud. By its plain terms, a fraud investigator would review the evidence, finalize a fraud report, and then the case would be reviewed by an adjudicating officer. There is no record that the adjudicating officer ever saw or considered the material. Furthermore, although this communication mentions some inconsistencies in the testimony of appellants, we do not know whether and how the adjudicating officer reconsidered these inconsistencies in light of the rebutting evidence that Mr. Yafai submitted and whether those inconsistencies were at all germane to the allegation of smuggling or to the validity of the evidence proffered by the family.

affidavit or similar evidence, that it actually took into consideration the evidence presented by the applicant and point to some factual support for the consular officer's decision to discount that evidence. In a case such as this one, where the Government makes no representation that such a demonstration would endanger national security, examination of the Government's explanation, in camera if appropriate, ought to satisfy any other legitimate concerns of the Government against disclosure in a public record.

The Constitution gives Congress plenary authority over immigration matters and, as the Government reminds us, delegated a great deal of that authority to the Executive. The finely tuned provisions of the Immigration and Nationality Act delegate a great deal of authority to the Executive in immigration matters and, properly applied, the consular privilege ensures that that delegation of authority is not diluted by overly intrusive judicial proceedings. We cannot forget, however, that Congress has given the Judiciary the obligation to curb arbitrary action. It has made no exception for the action of consular officers. Congress did not, and would not, sanction consular officers' making visa decisions in a purely arbitrary way that affects the basic rights of American citizens. We have the responsibility to ensure that such decisions, when born of laziness, prejudice or bureaucratic inertia, do not stand. As long as Congress keeps in place our statutory responsibility, we show no respect for the Constitution or for Congress by taking cover behind an overly expansive version of a judge-made doctrine.

I respectfully dissent.